Marvin Lee **AIKENS** et al.,
Plaintiffs,

v.

Russell E. **LASH** et al.,
Defendants.

Civ. A. No. 72 S 129.

United States District Court,
N. D. Indiana,
South Bend Division.

Feb. 14, 1975.

---

Harold R. Berk, Russell E. Lovell, II, Cynthia A. Metzler, Legal Services Organization of Indianapolis, Inc., Indianapolis, Ind., for plaintiffs.

Theodore L. Sendak, Atty. Gen., Robert F. Hassett, and Lon E. Mullins, Deputy Attys. Gen., State of Ind., Indianapolis, Ind., for defendants.

### SUPPLEMENTARY MEMORANDUM AND DECISION

GRANT, District Judge.

This civil rights action, seeking various forms of injunctive and declaratory relief, was brought pursuant to Title 42, United States Code § 1983 et seq., by nine named plaintiffs, all of whom were then inmates of Indiana State Prison who had been transferred to the prison from the Indiana Reformatory. Plaintiffs attacked their transfer from the reformatory to the prison, and their confinement in segregation units upon arrival at the prison, all without a due process hearing, and also challenged many conditions and practices to which they were subjected, including a censorship program which prevented them from receiving literature which did not pose a clear and present danger to the security of the prison.

This court ordered that the cause be maintained as a class action pursuant to Rule 23(a)(1), F.R.Civ.P. The action was tried for approximately two weeks at the Indiana State Prison and on 23 January 1974 this court issued its ruling on many of the issues presented in the action. Aikens v. Lash, 371 F.Supp. 482 (N.D.Ind.1974). Noting some recent shifts in law in the area of prison censorship, the court withheld consideration

of the literature censorship issue until such time as the Seventh Circuit Court of Appeals had an opportunity, in its en banc rehearing of Morales v. Schmidt, No. 72–1373, to determine what standard should be applied in reviewing prisons' censorship of personal correspondence. The Court of Appeals has now issued an en banc opinion in that case. Morales v. Schmidt, 494 F.2d 85 (7th Cir. 1974).

On 19 November 1974 plaintiffs filed a motion to dismiss their claim for injunctive relief as to the literature censorship issue and requested only a declaratory judgment with respect to that issue. Plaintiffs noted that defendants' Exhibit H, received in evidence at a hearing on 17 October 1974, contained a state-wide regulation concerning literature censorship released by the Indiana Department of Correction.[1] In view of the fact that no injunction could be sought against such a regulation on the grounds of its unconstitutionality without the convening of a three-judge court, plaintiffs moved to dismiss the claim for injunctive relief respecting literature censorship, but noted that the court could consider the request for declaratory relief without convening a three-judge court. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Defendants made no objection to the motion to dismiss and on 5 February 1975 plaintiffs' claim for injunctive relief was dismissed.

■ This court thereupon proceeded to consider plaintiffs' request for declaratory relief with respect to the literature censorship issue. Plaintiffs argue that literature censorship can be exercised by a prison only when the prison can establish that the censored material would pose a clear and present danger to the security of the prison. In Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967), this Circuit had held that censorship of liter-

ature was in violation of a prisoner's rights only when the prisoner could establish that the prison had abused its discretion in the censoring of published material. Thereafter, the federal courts had adopted a "variety of widely inconsistent approaches to the problem". *Procunier, infra.*, 416 U.S. at 406, 94 S. Ct. at 1808. Some even held that prisons had the burden of establishing that there was a compelling state interest for excluding the material or that the material constituted a clear and present danger to the security of the prison. Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968) and Wilkinson v. Skinner, 462 F. 2d 670 (2nd Cir. 1972). In the midst of the confusion and without the benefit of definitive guidelines by the United States Supreme Court in this area, the Seventh Circuit issued its en banc opinion in Morales v. Schmidt, 494 F.2d 85 (1974). This Seventh Circuit held therein that censorship would be permitted where the state showed on challenge that restriction was related reasonably and necessarily to the advancement of a justifiable purpose of imprisonment. *Morales, supra,* at 87. Shortly thereafter the United States Supreme Court handed down its opinion in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). That court noted the confusion which had arisen over the disparity of judicial standards and the need for guidance from the Supreme Court. The court then held that in the case of direct personal correspondence, both the prisoner and the outside party had an interest in the communication and in the First Amendment guarantee of freedom of speech, and that the Fourteenth Amendment required that the communication be protected from unjustified governmental interference. The court held that such interference must be shown to be in furtherance of the substantial governmental interests of security, order and rehabilitation and that

---

1. Although there had been a previous directive on literature censorship issued by the Indiana Department of Correction, the evidence presented at the original trial of this cause established that the directive was not used in the making of literature censorship decisions at the Indiana State Prison.

the interference must be no greater than necessary or essential to protect the legitimate governmental interest involved. *Procunier, supra,* 416 U.S. at 413, 94 S.Ct. 1800.

█ While this court recognizes that the mail being censored in the case before us is published material and not personal correspondence, we find that the author of such material has a similar interest in having such mail delivered to the prisoner and that the First Amendment guarantee of free speech, and the Fourteenth Amendment, protect such published material from unjustified governmental interference. Very recently this Seventh Circuit vacated a district court ruling on prison censorship of published material, thus indicating that the standards set out in *Procunier* applied. Gaugh v. Schmidt, 498 F. 2d 10 (7th Cir. 1974). The significance of the right involved and the need for one clear standard of review require, and we hold, that the standard set forth in *Procunier, supra,* applies in this action. The plaintiffs contend that the standard of review set forth in *Procunier* actually means that the prison must establish that the censored literature poses a clear and present danger to the security of the prison. We must reject this contention. We find that the standard set forth in *Procunier* speaks for itself and is less stringent than "clear and present danger". In fact, the Supreme Court, after noting the various ap-

proaches which various courts had applied to censorship, spoke as follows: "[A]t the other extreme some courts have been willing to require demonstration of a 'compelling state interest' . . . . Other courts phrase the standard in similarly demanding terms of 'clear and present danger'." *Procunier, supra,* 416 U.S. at 406–407, 94 S.Ct. at 1808.

█ In his concurring opinion in *Morales* Chief Judge Swygert indicated that he would require that any restriction be reasonably and necessarily related to a justifiable purpose of imprisonment and that there be a substantial necessity for the restriction.[2] If the standard which Judge Swygert described differs in any way from the one prescribed by the Supreme Court, it certainly is not weaker. Judge Swygert indicated that his recommended standard would be less forceful than the 'compelling interest' test. Likewise, we find that the test set out in *Procunier,* is less stringent than a "clear and present danger to the security of prison". Furthermore, the standard set forth in *Procunier* would permit those restrictions which further the governmental interests in order and rehabilitation as well as security.[3]

In determining whether the defendants have complied with the standard set forth above, we must examine the regulation on censorship of the Indiana Department of Correction as issued on 18 February 1974. As heretofore noted,

2. Judge Swygert wrote as follows: "Judge Pell would require 'that the State must show on challenge that such restriction [of First Amendment rights] is related both reasonably and necessarily to the advancement of a justifiable purpose of imprisonment.' I would add to Judge Pell's formulation by requiring the State to assume a heavy burden of justification. This, in my opinion, would require that prison officials demonstrate the restriction is not only reasonable but there is a substantial necessity for it. This more forceful standard would be *less than a compelling State interest* but clearly more than a rational relationship between the restriction and prison discipline and rehabilitation." (Emphasis added.) *Morales, supra,* 494 F.2d at 88.

3. Plaintiffs argue that the governmental interest of rehabilitation cannot be considered when applying the test set forth in *Procunier.* In discussing the state's restriction of direct personal correspondence, the court did note that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation". *Procunier, supra,* 416 U.S. at 412, 94 S.Ct. at 1811. Inasmuch as the Supreme Court went on to set up its censorship test which included the government's interest in rehabilitation, we must conclude that rehabilitation should be considered in justifying restrictions, but the positive effect of the right to correspond will have to be weighed in the balance.

the evidence presented at the trial established that, although a directive on literature censorship from the Department of Correction was in effect at that time, the State Prison here under challenge sought to censor literature on the basis of its own policy position paper and, as a matter of fact, the prison official who made those censorship determinations acted in a more restrictive manner than the policy position paper of the prison directed. See *Aikens, supra*, 371 F. Supp. at 499. Accordingly, this court will review the Department of Correction's 1974 regulation as well as the prison's policy position paper and the actual censorship practices which were in effect in the prison.

The Indiana Department of Correction's regulations on literature censorship as issued on 18 February 1974, and as contained in its Manual of Policies and Procedures, provides in pertinent parts as follows:

*General*

Institutions shall allow inmates access to periodicals to the greatest degree consistent with institutional goals, and without impairing internal discipline and security. The determination of whether a specific periodical will be permitted in the institution shall be made in conformity with the procedures and criteria stated herein. Approved periodicals and newspapers may be received by inmates directly from the publisher. In addition, institutions may subscribe to approved periodicals in sufficient quantity to give coverage in the institution and to provide for the diverse interests of the inmate population.

No periodical shall be prohibited solely on the basis of its appeal to a particular ethnic, racial, or religious audience. As a general rule, however, institutions should not permit inmates to receive periodicals that constitute a clear and present danger of a breach of prison discipline or security, or some other substantial interference with the orderly functioning of the institution or the rehabilitation of its inmates.

*Criteria*

In the judgment of the Indiana Department of Correction, the following types of periodicals constitute a clear and present danger of a breach of prison discipline or security, or some other substantial interference with the orderly functioning of the institution or the rehabilitation of its inmates:

1.  *Material of a Sexual Nature*—
    Periodicals of a sexual nature or which contain sexually-oriented material which, when taken as a whole, appear to be designed primarily to arouse sexual drives, cultivate sensual perception to sell or gain reader interest, or otherwise tend to appeal to the affective prurient interest in sex, are not approved. Photographs or paintings of nudes in a publication do not, per se, preclude the publication from being permitted in the institution, if the photos or paintings are supportive or incidental to a theme not designed primarily to arouse sexual drives.

2.  *Material of an Inflammatory or Discriminatory Nature*—
    Periodicals which, when taken as a whole, are readily susceptible to an interpretation encouraging aggressive hostility toward prison authorities or toward members of a particular race, religion, or ethnic group, or having a substantially inflammatory effect on inmates, are prohibited. This includes material that seriously degrades a race or religion, or that is in any way subversive of institution discipline. The extent or tone with which the race doctrine is emphasized is a legitimate consideration in this regard.

3.  *Material Dealing with Details of Criminal Activity*—
    Periodicals which deal with the details of criminal activity or behavior are not approved. This type of

material includes stories, articles, or pictures glorifying criminals, discussing the *modus operandi* of a felon, or treating in a bizarre fashion the details or circumstances of a crime.

*Magazines*

The "Approved Magazine List for Indiana Adult or Felony Correctional Institutions," as prepared and periodically updated by the Library Committee of the Indiana Department of Correction, shall be recognized as a standard for types of magazines available to inmates by private subscription or from the institution by subscription from budgeted funds. Institutions shall permit the receipt of any magazine included in the "Approved Magazine List." When the institution's authorities believe that a specific magazine should be approved or disapproved for circulation in the institution on the basis of the above criteria, the Warden or Superintendent shall notify the Commissioner requesting the specific addition to or deletion from the list, or rejection of the material if not on the list, and shall, forward therewith copies of the publication in question.

■ Plaintiffs have argued that all three criteria for censorship of literature set forth in the regulation are in violation of the First and Fourteenth Amendments under the standard set out in *Procunier, supra*.[4] Plaintiffs object only to that portion of the first criterion which would permit the censorship of pictures of nudes if they are not supportive or incidental to a theme which was not designed primarily to arouse sexual drives. This type of regulation could be used to prohibit pictures of nudes which are connected with no theme whatsoever. Such a regulation has not been, nor could it be established to be, in furtherance of the substantial

government interests of security, order or rehabilitation, as required by *Procunier, supra*.

■ We further find that Indiana's second criterion is also too broad to be justified under the two-part test set forth in *Procunier*. The phrase "material that seriously degrades race or religion" is not narrow enough to reach only that material which encourages violence. See *Procunier, supra,* 416 U.S. at 416, 94 S.Ct. 1800. Further, such a phrase invites institutional officials and employees "to apply their own personal prejudices and opinions as standards for prisoner mail censorship". *Procunier, supra,* 416 U.S. at 415, 94 S.Ct. at 1812.

■■ Plaintiff attacks the third criterion, regarding "Material Dealing with Details of Criminal Activity", on the grounds that it prohibits material that is not part of any criminal scheme. This court will not hold that no justification could ever be presented for some rule that restricts material other than on the very narrow grounds for which plaintiffs contend. As this court has noted, some restrictions can be justified if they further the governmental interest in rehabilitation, and certain articles that depict criminal activity which is not part of a criminal scheme at the prison or a threat to the security of the prison might be justifiably restricted to further the rehabilitation which a prison might be attempting. However, the rule set forth by the Department of Correction is too overly broad to be justified under the *Procunier* test. The rule refers to material which glorifies criminals, rather than plain criminal activity. As such, the rule could be used to restrict articles or books either written by or dealing with a person who has been convicted of a crime, whether or not their criminal activity is glorified or even discussed. Further, this rule provides no definition of the term "criminal" and, as plaintiffs contend, this rule

---

4. In attacking this regulation, plaintiffs are apparently relying on the arguments in their post trial brief which were directed to the previous directive from the Department of Corrections, which contained essentially the same criteria.

could reach material regarding civil disobedience.

Accordingly, this court finds that the Department of Correction's regulation regarding literature censorship is in violation of the First and Fourteenth Amendments. In his concurring opinion in *Morales,* Judge Stevens emphasized the value of the State's having a comprehensive, written regulation on prison censorship. See *Morales, supra,* 494 F. 2d at 87–88. In that regard this court is constrained to make one further comment. In furtherance of a desire to make its regulation comprehensive, the Department of Correction provided a list of approved publications. As long as such lists are not intended to be exclusive, they could be helpful by listing publications that are permissible under the regulation which some officials might otherwise mistakenly restrict. However, the State's acceptable publications list, as revised in February 1974, is not as instructive as it might be. It lists 1,411 publications, a preponderance of which are trades and craft journals. With the possible exception of Playboy Magazine and Muhammed Speaks, the list is apparently devoid of publications which even the strictest censor might mistakenly question. A more comprehensive and meaningful list might be instructive to the various state institutions and avoid unnecessary litigation.

Both the Warden of the Indiana State Prison and the Director of Classification for the prison testified that censorship of literature was accomplished pursuant to a prison policy position paper. The pertinent provisions of that paper are as follows:

CENSORSHIP OF MAIL—The prison requests that a policy be established whereby the prison would only regulate mail if during the regulation of mail there is probable cause to believe that the mail is violating prison discipline, security, or order then such mail would be forwarded to the Commissioner of Correction for his evaluation and determination. This policy would apply to both incoming and outgoing mail.

PRINTED LITERATURE—(Newspapers, periodicals, magazines, books) the same policy in regards to mail should apply to literature. The general criteria to determine if the literature violates prison discipline, security, or order could be as follows:

1. Literature should not incite prisoners to riot, violence, or racial hatred.

2. Literature should not describe, depict strategy or the use of weapons which would include guns, knives, bombs, karate, judo.

3. Literature should be censored when its sole purpose is to sexually stimulate or sexually degrade the human body. When the purpose of the literature is other than sexually degradation, it should be permitted.

PICTURES AND DRAWINGS—Pictures and drawings of sexual organs, obscene pictures, lewd and/or suggestive pictures and positions depicting sexual acts will be subject to disciplinary action. This ruling is further explained in Burns Statute 10–2803 entitled "Obscene Literature and Devices".

Under this policy, human bare breasts and buttocks would be permissible; however, the male and female sexual organs would not be permissible.

Plaintiffs object to the first point in the position paper to the extent that it would seek to prohibit material which incites prisoners to racial hatred. Plaintiffs contend that such a prohibition could go beyond material which incites violence and as such the rule is unconstitutional. However, the restriction contains a very precise statement that is not open to overly broad interpretations, and is obviously necessary for the furtherance of order in a restricted and racially mixed environment such as the prison. Accordingly, in applying the test set forth in *Procunier,* this court finds that such a restriction furthers

the substantial governmental interests of security and order, and the restriction is no greater than is necessary or essential.[5] Plaintiffs, understandably, do not question the constitutionality of the second point in the position paper, which would restrict material that demonstrates the use of weapons.

Plaintiffs attack the position paper's third restriction—regarding writings and pictures of a sexual nature —on the grounds that such material can be restricted only within the limits of the United States Supreme Court's constitutional standard on obscenity, as set forth in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). However, this court does not reach the question of whether some lesser standard of restriction would be permissible, in view of the obvious overbreadth of the restriction in question. This regulation would prohibit literature which would "sexually degrade" the human body; such vague terminology invites officials "to apply their own personal prejudices and opinions as standards" for censorship. Procunier, supra, 416 U.S. at 415, 94 S.Ct. at 1812. Such an overly broad restriction fails to meet the two-part test set forth in Procunier. Further, in treating pictures and drawings the regulation would not even allow any complete pictures and drawings of nudes. This regulation is clearly in violation of the First and Fourteenth Amendments under the finding this court has already made regarding the first criterion in the Department of Correction's regulation.

Next, this court must examine the literature censorship practices as they have been shown to actually exist at the Indiana State Prison. The Director of Classification at the State Prison has been delegated the duty of inspecting and censoring incoming literature. Although certain publishers and periodicals are automatically banned, the Director examines each issue of other periodicals and determines individually whether each should be permitted to enter. In making these censorship determinations, the Director follows a policy position paper on censorship prepared at the prison two or three years ago. The evidence disclosed, however, that the actual censorship practice at the prison is even more restrictive than either the prison's censorship paper or a broader policy adopted by the Indiana Department of Correction. As an example, the Director of Classification testified that he would exclude one published item on the basis that it was communist-inspired by which he meant that it was written by a communist. In examining the actual literature censorship practices at the prison, this court must also examine the published materials which have been prohibited from distribution to the inmates. Plaintiffs have introduced into evidence numerous books, magazines and newspapers which were allegedly denied to inmates, and defendants have submitted a stipulation listing many published materials which were—or would be—denied to the inmates. Plaintiffs have requested that this court examine some of the items in question and remand the remainder to the officials at the Indiana State Prison for further consideration. One book which the Director of Classification testified he would not permit to enter the prison was Quotations of Chairman Mao Tse-Tung. In support of this exclusion, the Director testified that he would prohibit this work for the reason that it was communist-inspired and he added, by that he meant that it was written by a communist. However, the Commissioner of the Department of Correction testified that he believed that he would permit an inmate to receive the book. This book is an expression of the view of a communist spokesman on a wide range of political and social topics and this court finds that the defendants have not established that the restriction of this book is necessary to the furtherance of the important and substantial

5. Prisons can not only restrict material which incites violence, but can also restrict material which encourages violence. Procunier, supra, 416 U.S. at 416, 94 S.Ct. 1800.

government interests in the manner required by *Procunier, supra*.

The Director of Classification also testified that, at the Warden's direction, all copies of Playboy Magazine were absolutely prohibited to the inmates. This action was certainly consistent with the prison policy position paper's prohibition of complete pictures of nudes—which regulation this court has already found to be in violation of the First and Fourteenth Amendments. Also, the evidence in this action revealed that inmates at all other State institutions are allowed to receive this magazine and the magazine is listed on the Department of Correction's acceptable publications list. Accordingly, this court finds that the restriction of this magazine, in its present form, is not in furtherance of the important and substantial governmental interests in the manner required by *Procunier*.

Literature censorship at the prison was based on the constitutionally defective policy position paper. Additionally, it was even more restrictive than that policy required. Finally, certain printed material was excluded which this court found constitutionally should not have been excluded. Accordingly, this court finds that the actual literature censorship practices at the Indiana State Prison are in violation of the First and Fourteenth Amendments.

This court finds further that neither the 18 February 1974 regulations on censorship from the Department of Correction, the policy position paper of the Indiana State Prison, nor any other practices or procedures in effect at the prison, provide the inmate any adequate type of review within the prison system, (once a determination has been made that he should not have access to published material which he had ordered), as demanded by the First and Fourteenth Amendments. The First Amendment right involved here is a "liberty interest" under the Fourteenth Amendment and as such the following form of review would be required: (1) The inmate should be given prompt written notice that he is being denied the opportunity to receive a particular printed matter and the reason for that denial; (2) the inmate should be provided an opportunity to object within a reasonable specified time period; and (3) the complaint should be promptly reviewed by a prison official other than the person who originally denied the inmate access to the printed matter.

For the reasons stated above, this court would hereby find for the plaintiffs on their claim for declaratory relief on the issue of literature censorship. Further, this court would DECLARE that the Indiana Department of Correction's regulations on literature censorship, as issued 18 February 1974 and contained in its Manual of Policies and Practices; the policy position paper of the Indiana State Prison, as it applies to literature censorship; and the actual practices regarding literature censorship, are in violation of the First and Fourteenth Amendments of the Constitution of the United States.

Finally, assuming that this court is so empowered, we would remand to defendant officials at the Indiana State Prison for further consideration, those books, magazines and newspapers, that were submitted to this court as having been denied to the inmates but which were not specifically examined in this Supplementary Memorandum and Decision.

Plaintiffs' counsel is invited to prepare and submit proposed findings, decree and declaratory relief consistent with the foregoing Supplementary Memorandum and Decision.