**Marvin Lee AIKENS et al.,**
**Plaintiffs-Appellees,**

v.

**Leo D. JENKINS, etc., et al.,**
**Defendants-Appellants.**

**No. 75–1430.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1975.

Decided April 14, 1976.

Darrel K. Diamond, Asst. Atty. Gen., Indianapolis, Ind., for defendants-appellants.

Harold R. Berk, Russell E. Lovell, II, Cynthia A. Metzler, Indianapolis, Ind., for plaintiffs-appellees.

Before ADAMS * and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.**

TONE, Circuit Judge.

Plaintiffs, who are inmates of Indiana State Prison, challenge certain statewide regulations promulgated by the Indiana Department of Correction which provide for censorship of literature.

Originally plaintiffs' complaint under 42 U.S.C. § 1983 challenged disciplinary trans-fers and other prison practices. The challenge to censorship of literature was made by amended complaint shortly before the trial. After hearing the evidence the court, in an opinion reported in 371 F.Supp. 482 (N.D.Ind.1974), resolved several issues in favor of plaintiffs but reserved the censorship issue to await this court's decision in *Morales v. Schmidt*, 494 F.2d 85 (7th Cir. 1974) (decision on rehearing in banc of a panel decision reported at 489 F.2d 1335 (1973)), which was handed down in March 1974. In April 1974, the Supreme Court decided *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), which established principles that control this case. Following these decisions, the District Court in the case at bar, having conducted a further hearing, held the statewide Department of Correction ("DOC") literature censorship regulations violative of the First Amendment in certain respects. 390 F.Supp. 663 (N.D.Ind.1975). The court also ruled on a policy position paper of the Indiana State Prison and the actual censorship practices at the prison, *id.*, but these rulings are not challenged on appeal.

The case is in a peculiar posture. So far as the record shows, the DOC regulations under review have never been applied or interpreted. The defendant prison officials, in fact, were unaware that these regulations existed until they were unearthed during this proceeding. The censorship practices on which the District Court heard evidence were based on local prison policies, not on the DOC regulations before us. Plaintiffs contend, and the District Court held, that the DOC regulations are invalid on their face.[1]

1.

The standard for a determination of facial invalidity was recently stated in *Erz-*

* The Honorable Arlin M. Adams, United States Circuit Judge, United States Court of Appeals for the Third Circuit, is sitting by designation.

** The Honorable William J. Campbell, Senior District Judge, United States District Court for the Northern District of Illinois, is sitting by designation.

1. The issues arising from these regulations were not raised by the pleadings, but were tried and submitted by consent of the parties. Appellants do not contend that the issues were not properly before the District Court.

*noznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125, 135 (1975). A statute "should not be deemed facially invalid unless [1] it is not readily subject to a narrowing construction by the state courts, . . . and [2] its deterrent effect on legitimate expression is both real and substantial." Compare *NAACP v. Button,* 371 U.S. 415, 432–433, 83 S.Ct. 328, 337–338, 9 L.Ed.2d 405, 417–418 (1963). Two observations are necessary because of the context in which the *Erznoznik* test must be applied in the case at bar:

■ When the first, or narrowing-construction, prong of the test is applied to a statute or a municipal ordinance, the hypothetical narrowing construction would be made by the state court, as the Supreme Court recognized in the quoted passage. In the case at bar, however, we are dealing with administrative regulations which, unlike statutes or municipal ordinances, are designed to be interpreted in the exercise of a prior restraint by the state officers who will administer the regulations. Accordingly, it is they who will be providing the narrowing construction, if one is to be provided. Theoretically it should perhaps be immaterial which instrumentality of the state has the responsibility of interpreting the challenged regulation. The likelihood of a reasonable interpretation is normally to be presumed. We cannot fail to observe, however, that the prison officials who will be applying the regulations under review did not even know the regulations existed until this litigation was commenced, and that those officials interpreted the local prison policies of which they were aware to exclude, *inter alia,* Dostoevski's *The Gambler,* Gibran's *The Prophet,* and all publications of Bantam Books.

■ Under the second prong of the *Erznoznik* test, which refers to the deterrent effect on legitimate expression, attention may be focused on the conduct of either the censors or the prison inmates. Since the facet of the First Amendment protection under review is the right to receive information, see *Procunier v. Martinez, supra,* 416 U.S. at 408–409, 94 S.Ct. at 1808–1809,

40 L.Ed.2d at p. 237 and *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969), it is appropriate to consider the effect which a restrictive regulation, through its impact on the censors, may have on the flow of information to the persons whose right is asserted. The regulation may also affect a prisoner's own conduct. He may fear that an attempt to obtain the publication will result in some form of official reprisal, direct or indirect, and therefore he may be inhibited from ordering or subscribing for the material. *Cf. Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 1496, 14 L.Ed.2d 398, 402 (1965).

### 2.

■ What we have said also suggests that the plaintiff inmates have standing to challenge the regulations on their face, a proposition defendants do not question. The standard for justiciability is whether the plaintiffs are "immediately in danger of sustaining some direct injury as the result of [the regulations'] enforcement, and not merely that [they suffer] in some indefinite way in common with people generally," *Frothingham v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, 1085 (1923); see also *O'Shea v. Littleton,* 414 U.S. 488, 493–494, 94 S.Ct. 699, 674–675, 38 L.Ed.2d 674, 681–682 (1974); or whether the facts "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 829 (1941), quoted in *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113, 117 (1969). The enforcement of the challenged regulations poses a threat of sufficient immediacy and injury to justify the relief which is sought. See 6A Moore's *Federal Practice* ¶ 57.18[2], at p. 57–184 (2d ed. 1975).

### 3.

■ Any doubt remaining after *Procunier v. Martinez, supra,* that prisoners, as

distinguished from persons seeking to communicate with them, have rights under the First Amendment could not survive *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974), in which the Court said:

> "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system . . . ."

It is also clear that the First Amendment right of prisoners extends to published literature. Although *Procunier v. Martinez* dealt with censorship of prisoner's mail, we indicated, shortly after it was decided, our view that the standards it prescribes are applicable to censorship of published materials. *Gaugh v. Schmidt,* 498 F.2d 10 (7th Cir. 1974).[2] Other courts have agreed. *Morgan v. LaVallee,* 526 F.2d 221, 224–225 (2d Cir. 1975); *McCleary v. Kelly,* 376 F.Supp. 1186, 1190–1191 ·(M.D.Pa.1974); *The Luparar v. Stoneman,* 382 F.Supp. 495, 498–499 (D.Vt.1974). See also *Burke v. Levi,* 391 F.Supp. 186, 190–191 (E.D.Va. 1975); *Battle v. Anderson,* 376 F.Supp. 402, 425–426 (E.D.Okla.1974).

The First Amendment right to receive information and ideas is more limited for prisoners, however, than for other members of society. "First Amendment guarantees must be 'applied in light of the special characteristics of the . . . environment.'" *Procunier v. Martinez, supra,* 416 U.S. at 409–410, 94 S.Ct. at 1809, 40 L.Ed.2d at 238, quoting from *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737 (1969). The burden of showing such special characteristics justifying restrictions on First Amendment rights is on those who seek to impose the restrictions. To justify a prison censorship regulation, prison officials must show that it "furthers one or more of the substantial governmental interests of security, order, and rehabilitation." *Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240. In addition, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.*[3]

4.

The Indiana Department of Correction regulations begin with a recognition that inmates should be allowed "access to periodicals to the greatest degree consistent with institutional goals, and without impairing internal discipline and security." The regulations then proceed to declare that certain described "types of periodicals constitutes [sic] a clear and present danger of a breach of prison discipline or security, or some other substantial interference with the orderly functioning of the institution or the rehabilitation of its inmates." Then follow descriptions of the "types of periodicals," classified in three categories, which are viewed as meeting the "clear and present danger" test.

We pause to note that, as the District Court correctly recognized, 390 F.Supp. at 667, *Procunier v. Martinez* does not establish a clear and present danger criterion. We judge the regulations before us by the criteria prescribed in that case.

---

2. A number of cases prior to *Procunier v. Martinez* recognize the prisoner's First Amendment right to receive literature. *Rowland v. Sigler,* 327 F.Supp. 821, 824 (D.Neb.1971), *aff'd sub nom., Rowland v. Jones,* 452 F.2d 1005, 1006 (8th Cir. 1971); *Loaman v. Hancock,* 351 F.Supp. 1265, 1267 (D.N.H.1972); *Fortune Society v. McGinnis,* 319 F.Supp. 901, 904 (S.D.N.Y.1970).

3. This court, sitting in banc and speaking through Judge Pell in *Morales v. Schmidt, supra,* decided about one month before *Procunier v. Martinez,* correctly anticipated the holding of the latter case: ". . . the State must show on challenge that such restriction [on a prisoner's right of free expression] is related both reasonably and necessarily to the advancement of a justifiable purpose of imprisonment." 494 F.2d at 87.

### a.

The first censorship regulation to be reviewed is labelled "Material of a Sexual Nature." Plaintiffs challenge only the last sentence, which we have italicized:

> "Periodicals of a sexual nature or which contain sexually-oriented material which, when taken as a whole, appear to be designed primarily to arouse sexual drives, cultivate sensual perception to sell or gain reader interest, or otherwise tend to appeal to the effective prurient interest in sex, are not approved. *Photographs or paintings of nudes in a publication do not, per se, preclude the publication from being permitted in the institution, if the photos or paintings are supportive or incidental to a theme not designed primarily to arouse sexual drives."*

The District Court held the challenged sentence invalid for overbreadth, stating,

> "This type of regulation could be used to prohibit pictures of nudes which are connected with no theme whatsoever. Such a regulation has not been, nor could it be established to be, in furtherance of the substantial government interests of security, order or rehabilitation, as required by *Procunier, supra."* 390 F.Supp. at 669.

 We note, to begin with, that nude pictures which "appear to be designed primarily to arouse sexual drives . . . or otherwise tend to appeal to the affective prurient interest in sex" are already forbidden by the first sentence, which plaintiffs do not challenge.[4] The censor applying the regulation is therefore likely to be looking for some additional message in the second sentence. What other kinds of pictures does it forbid? The sentence says that pictures of nudes are not *per se* forbidden if they are supportive or incidental to a nonprurient theme. Otherwise, it follows, they are *per se* forbidden. Pictures of nudes may appear in a collection of works of art. Such accompanying text as there is may

contain nothing that a censor would consider to contain a theme, prurient or otherwise. Even if the censor were imaginative enough to find permissible themes in the pictures themselves, he might well conclude that the words "supportive or incidental to" contemplate that the theme be external rather than in the pictures themselves. The sentence prohibits far more than is necessary for the protection of any of the substantial governmental interests described in *Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240. The defendant prison officials, who have the burden of justifying any censorship regulation, have not attempted to justify so broad a prohibition. The last sentence is therefore invalid as overbroad.

### b.

The second challenged regulation, entitled "Material of an Inflammatory or Discriminatory Nature," states as follows:

> "Periodicals which, when taken as a whole, are readily susceptible to an interpretation encouraging aggressive hostility toward prison authorities or toward members of a particular race, religion, or ethnic group, or having a substantially inflammatory effect on inmates, are prohibited. This includes material that seriously degrades a race or religion, or that is in any way subversive of institution discipline. The extent or tone with which the race doctrine is emphasized is a legitimate consideration in this regard."

 The District Court held this overbroad because "[t]he phrase 'material that seriously degrades race or religion' is not narrow enough to reach only that material which encourages violence," and invites prison officials " 'to apply their own personal prejudices and opinions as standards' " (quoting from *Procunier v. Martinez,* 416 U.S. at 415, 94 S.Ct. at 1812, 40 L.Ed.2d at 241). 390 F.Supp. at 669.

---

4. Obscenity (see *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)) is of course not the test. The state may prohibit obscene material inside the prison as it does outside; but it may also deny prisoners access to materials that are not obscene, if it can establish that doing so furthers a governmental interest protectible under *Procunier v. Martinez.*

We agree, and add that the provision is too broad in other respects also. In the phrase on which the District Court focused and in the disjunctive prohibition against material "having a substantially inflammatory effect on inmates," the regulation is very similar to the prohibition of "inflammatory political, racial, religious or other views," and "defamatory" matter held overbroad in *Procunier v. Martinez,* 416 U.S. at 415–416, 94 S.Ct. at 1812, 40 L.Ed.2d at 241.[5] Material on atheism or agnosticism, for example, might be viewed as seriously degrading religion and yet be no threat to legitimate governmental interests. The state is not, however, powerless to regulate in this area. Material that may reasonably be thought to encourage violence may be prohibited by a narrowly drawn regulation. See *Procunier v. Martinez, supra,* 416 U.S. at 416, 94 S.Ct. at 1812, 40 L.Ed.2d at 241.

■ Also, the phrase "in any way subversive of institutional discipline" is similar to phrases held invalid in *Procunier v. Martinez,* 416 U.S. at 415–416, 94 S.Ct. at 1812, 40 L.Ed.2d at 241, *viz.,* "criticizing policy, rules or officials," "disrespectful comments," and "derogatory comments." A censorship regulation which can reasonably be interpreted by prison officials as authority "to suppress unwelcome criticism" is too broad. *Id.*

c.

■ The last of the challenged regulations is entitled "Material Dealing with Details of Criminal Activity." It provides as follows:

"Periodicals which deal with the details of criminal activity or behavior are not approved. This type of material includes stories, articles, or pictures glorifying criminals, discussing the *modus operandi*

of a felon, or treating in a bizarre fashion the details or circumstances of a crime." The District Court correctly held (390 F.Supp. at 669) that this regulation is overbroad. Applied literally, it would exclude many of the world's great books. The state's legitimate interest in preventing inmates from receiving material likely to encourage and teach criminal behavior and thus threaten security, order, and rehabilitation can be adequately protected by a much narrower and more specific rule.

5.

While we cannot order the defendants to draft and issue new regulations, we call their attention to the desirability of imposing prison censorship by carefully drawn regulations rather than *ad hoc* decisions, as pointed out by Mr. Justice (then Judge) Stevens in his concurring opinion in *Morales v. Schmidt, supra,* 494 F.2d at 88.

If the defendants in this case do undertake to prepare and adopt "carefully drawn" regulations "which evidence awareness of the conflicting considerations that should influence particular decisions in this area" (Stevens, J., concurring, 494 F.2d at 88), they may find it useful to prepare, as the District Court suggested, a non-exclusive list of "publications that are permissible under the regulation which some officials might otherwise mistakenly restrict." 390 F.Supp. at 670. Such a list would both remove doubts as to the listed publications and illustrate the correct application of the regulations. Also, as Judge Swygert suggested in his concurring opinion in *Morales,* the state can minimize, if not eliminate, federal interference with its prison censorship regulations if it will include in those regulations procedural rules permitting inmates to challenge in a prison administrative proceeding the censorship decisions made in applying the regulations.[6]

---

**5.** The Court held this language overbroad both because it was "not narrowly drawn to reach only material that might be thought to encourage violence" and because its application was not "limited to incoming letters." 416 U.S. at 416, 94 S.Ct. at 1813, 40 L.Ed.2d at 242. Only the former ground, of course, applies here.

**6.** As Judge Swygert said,
"[S]uch procedure could have the effect of avoiding the risk of a constitutional attack on the rules themselves and at the same time afford the prisoner . . . the right to challenge such decisions at an administrative level. A regulation of this sort would aid the prisoner or parolee, the State, and the courts

If judicial review of future regulations becomes necessary, that review would be greatly aided by an evidentiary showing of why and how each restriction furthers the governmental interest it is intended to further. The evidence, which is likely to be in the form of expert opinions of experienced prison administrators, psychologists, and sociologists, should be as specific as the nature of the problem permits. Such a showing is more likely than mere rhetoric to assist the court in deciding whether the prison censorship regulations meet the standards of *Procunier v. Martinez*.

The judgment of the District Court is affirmed.

AFFIRMED.

since less resources would be required for all concerned if a matter such as here be first considered at an administrative level rather than in a court." 494 F.2d at 89.