Stephen L. USTRAK, Plaintiff-Appellee,
Cross-Appellant,

v.

James W. FAIRMAN,
Defendant-Appellant,
Cross-Appellee.

Nos. 85–1089, 85–1164.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1985.

Decided Jan. 9, 1986.

As Amended on Denial of Rehearing and
Rehearing En Banc March 13, 1986.

James P. Nally, Office of Illinois Atty. Gen., Chicago, Ill., for plaintiff-appellee, cross-appellant.

Stephen Kent Sheffler, Pelini, Crewell & Sheffler, Champaign, Ill., for defendant-appellant, cross-appellee.

Before BAUER, POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

Stephen Ustrak, an alumnus of the Illinois state prison at Pontiac, where he served time for burglary and related offenses and for bail jumping, won a verdict of almost $50,000 in compensatory and punitive damages for violations of his civil rights by the warden. 42 U.S.C. § 1983. The warden appeals. Ustrak cross-appeals from the grant of summary judgment in the warden's favor on one count in the complaint.

Ustrak is white, as were all the members of the jury; 80 to 90 percent of the prisoners in Pontiac are black, as is the warden, Fairman, although 80 to 90 percent of the prison staff is white. Two of the three claims on which Ustrak prevailed are claims of racial discrimination. The first arises from an incident in which Ustrak was penalized by withdrawal of commissary privileges for one month for having contraband in his cell. Ustrak's cellmate, who was black, was not disciplined, even though there apparently was a practice of punishing both cellmates for possessing contraband in the cell unless it was crystal clear that only one was guilty. Here it was not crystal clear, although the contraband was found on Ustrak's side of the cell. The guard who found the contraband and lodged charges against Ustrak but not his cellmate was white.

Although the warden approved the punishment of Ustrak, there is no evidence that he did so for racial reasons. This ought to end the matter, for no doctrine of superiors' liability is recognized in section 1983 cases. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1390 (7th Cir.1984); *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir.1985). But the warden waived this ground for challenging the verdict, by failing to object to instructions under which the jury had only to find that he had "purposefully and intentionally concurred in and acquiesced in the discriminatory proceedings brought against Mr. Ustrak." Although the meaning of this instruction is far from clear, we read it as allowing the jury to find against Fairman if it determined that he had been aware of and had approved of Ustrak's being punished even though Ustrak's cellmate was not punished; and of this awareness and approval there was some evidence.

But we do not think a rational trier of fact could have found that Ustrak was a victim of racial discrimination. The contraband was found on Ustrak's side of the cell, so it was natural that he rather than his cellmate was disciplined. There may

have been a practice of disciplining both cellmates in a situation such as presented in this case; but in no area of life is discipline meted out with perfect consistency. "Selective, incomplete enforcement of the law is the norm in this country." *Hameetman v. City of Chicago,* 776 F.2d 636, 641 (7th Cir.1985). This is not only because some violations are not detected, but also because the resources for law enforcement are often radically inadequate to the number of violations. The authorities must pick and choose; and given the well-known disciplinary problems of American prisons it is not to be believed that prison authorities never overlook known violations of disciplinary regulations. Moreover, Ustrak's charge of incomplete enforcement focuses on the failure to enforce not a written regulation but an unwritten policy by no means in keeping with the best American traditions: collective guilt. Although the evidence pointed to Ustrak's having brought the contraband into his cell, that policy required punishment of his cellmate as well, even though the cellmate probably was innocent. Failure to enforce consistently a rule of collective guilt is one of the less insidious examples of the selective enforcement of law, provided the inconsistency is not racially motivated.

The inevitability of selective enforcement suggests that if Ustrak's proof is enough to make out a prima facie case of racial discrimination, then whenever a black and a white commit the same offense and only one is punished, the other will have a prima facie case of racial discrimination. The racial makeup of Pontiac assures that most white prisoners will have black cellmates unless the prison is racially segregated, which would violate the Fourteenth Amendment. A white prisoner who is disfavored will point to the fact that the warden is black; a black prisoner to the fact that most of the staff is white. Thus, if the jury verdict stands, Pontiac's guards and officials are exposing themselves to potential liability for racial discrimination every time they fail to attain the unattaina-

ble—perfect consistency in enforcing the prison's rules, written and unwritten.

A prima facie case, whether under the equal protection clause of the Fourteenth Amendment or Title VII of the Civil Rights Act of 1964 or any other antidiscrimination principle that we are familiar with, requires proof of a state of facts that makes it more likely than not that there has been discrimination. See, e.g., *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 104 S.Ct. 2794, 2799–800, 81 L.Ed.2d 718 (1984). Since Ustrak had a cellmate of a different race, no significance can be assigned to the bare fact of a departure from consistent enforcement that favored the cellmate. Any departure had to injure one cellmate at the expense of another of a different race yet most inconsistencies in enforcement are unrelated to racial discrimination, being the result merely of imperfections in law enforcement. It would be insulting and unfair to Warden Fairman to presume that because he is black any unequal enforcement of prison regulations that hurts a white prisoner is the product of racial prejudice; and remember that it was a white guard who failed to charge Ustrak's black cellmate and that most of the prison staff is white.

Since the charge of discriminatory punishment must be dismissed, we have no occasion to consider whether, if it were proved, an award of damages would be a suitable remedy. Ustrak does not complain that it was wrong to punish him. He complains only that it was wrong not to punish his black cellmate also.

Ustrak's second complaint is that he was denied a job as a clerk in the prison library because of his race. For this wrong the jury awarded the remarkable sum of $15,-000 in compensatory damages—remarkable because Ustrak proved no injury beyond a self-serving, unelaborated, uncorroborated, and unsubstantiated conjecture that getting the job would have "increase[d] my typing skills. Right now, Your Honor, I can type 60 words a minute. It would also have given me something to get into the looking up of cases in law and possibly

becoming a researcher for a law firm upon my release from the penitentiary."

Ustrak testified that there were three vacancies in the library when he applied for a job there, that one was reserved for whites, that he didn't get the job, and that later he saw that all three vacancies had been filled by blacks. One can see here the shadow of Title VII, under which a prima facie case can be made out by showing that the plaintiff was denied a job for which he was qualified and that a person of another race got the job instead. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Pontiac operates under a consent decree which (rightly or wrongly) guarantees blacks the same percentage of prison jobs as their percentage of the prison population. There is evidence that, as the decree has been interpreted by the prison authorities, one job on the library staff of five or six has been reserved for whites, and the others for blacks; and there is some evidence that Ustrak was qualified for the "white" vacancy which instead went to a black.

But we do not think this adds up to a prima facie case of racial discrimination. The only thing that would be unlawful would be if the librarian with Fairman's connivance had turned down Ustrak because he is white. Of this there is no evidence. At most the evidence shows that the librarian overrode a racial preference for whites and gave the job to a black. That does not show racial animus. The consent decree was not adopted for the protection of white prisoners. In a prison that is 80 to 90 percent black (the record contains no more precise estimate), it would hardly be surprising, with or without a consent decree, if in a particular job classification that had only five or six jobs all were filled by blacks. If there were five jobs, one filled by a white, the percentage of blacks would be only 80 percent, less than their percentage in the prison, and the figure would rise only to 83 percent if there were six jobs (the record does not show whether there were five or six).

Since medical science does not yet know how to divide a person, like a planarian, into viable portions, no inference that the blacks got more than relative merit entitled them to can be drawn from the fact that three rather than two of the vacancies were filled by blacks; there is no evidence that the black who filled the "white" slot was unqualified.

■ The method adopted in *McDonnell Douglas* for making out a prima facie case is designed for the protection of minorities and women rather than of whites. Racial discrimination against whites is forbidden, it is true, but no presumption of discrimination can be based on the mere fact that a white is passed over in favor of a black. See *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir.1985). In *Christensen v. Equitable Life Assurance Soc'y*, 767 F.2d 340, 343 (7th Cir.1985), we pointed out that the existence of an affirmative action program cannot, standing alone, establish that an employer has discriminated against whites; otherwise affirmative action would be illegal per se, which it is not. The consent decree in this case, like the affirmative action program in *Christensen*, established a preference for blacks the lawfulness of which has not been questioned. A preference for blacks means, by the iron laws of arithmetic, a handicap for whites. Hence the existence of that handicap cannot by itself carry the day for a white who is complaining of racial discrimination; and that is all Ustrak has going for him in this case.

There is, we add, the gravest doubt whether a rational jury could have found, in the language of the instructions, "that the Defendant, Mr. Fairman, purposefully and intentionally concurred in and acquiesced in the denial of the Plaintiff's job application because of race." There is no evidence that Fairman even knew of Ustrak's application or that he approved the hiring of the black to fill the "white" vacancy on the library staff. There is however evidence that he or his designee approved all hiring of prisoners and that he was deeply involved in the administration of the consent decree; whether this is enough to prove that he "purposefully and intentionally concurred in and acquiesced in" the hiring of a black to fill the so-called white vacancy may be doubted but need not be resolved.

■ Ustrak's third complaint is more substantial. He claims and the jury found that he was refused a transfer to the "farm," a medium security facility within the prison (Ustrak was in the maximum security part of the prison), because the warden was annoyed by the ten or so letters that Ustrak had written him over a two-year period complaining about racial discrimination in disciplinary sanctions and about earlier denials of Ustrak's request for transfer to the farm. The prison's assignment committee had eventually recommended the transfer but the warden had turned it down on the ground that Ustrak had once jumped bail and was therefore a poor risk for the farm, which is easier to escape from than the maximum security part of the prison. Although the warden argues that bail jumpers were not eligible for the farm, the evidence on whether bail jumping was an absolute bar was conflicting and the jury could have found that it was not; the prison's assignment committee, as we have said, did not think it an absolute bar to transferring Ustrak. A rational jury could have found that the real reason for the warden's overruling the committee was that he was annoyed by Ustrak's letters.

As an original matter one might doubt whether convicted criminals should have much if any freedom of speech within prison walls; prison inmates are fractious enough as it is without having a right enforceable by damage suits against their keepers to complain continually about conditions for which their own conduct is largely responsible. But this seems not to be the Supreme Court's view. We say "seems not" rather than "is not" because all of the Court's cases dealing with free speech in prisons have involved communica-

tions with persons outside of the prison, a point stressed in *Procunier v. Martinez*, 416 U.S. 396, 408, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974), but dropped in later cases, such as *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), which involved communications among prisoners rather than with outsiders—but prisoners in different prisons. The lower courts have extended the right of free speech to internal prison communications, as in *Wolfel v. Bates*, 707 F.2d 932 (6th Cir.1983) (per curiam), which held that punishing a prisoner for complaining violates the First Amendment. See also *Safley v. Turner*, 777 F.2d 1307, 1311–13 (8th Cir. 1985). Whatever the merits of this extension, Warden Fairman makes no issue of it in this court. His only and insufficient argument is that the jury was unreasonable in inferring that he was acting in retaliation when he overruled his committee's recommendation (his opening brief states, with inexcusable inaccuracy, that he was following rather than overruling the recommendation). That is a purely factual question on which the jury's answer, being in fact reasonable, is conclusive on us.

■ But we agree with Fairman that the jury's damage award—$3,000 in compensatory damages and $15,000 in punitive damages—cannot stand. With regard to the award of compensatory damages, there is a complete failure of proof on the extent of the injury sustained by Ustrak. There is no credible evidence that his transfer to the "farm" was delayed by more than two months, and his only claim of actual damages is based on the loss during that period of the superior amenities of the "farm." He does not claim that he was deterred from his letter-writing campaign or that he was beaten or starved or otherwise savaged in the prison; only that it would have been nicer to have those extra two months at the "farm." How much nicer? On this question the record is barren of probative evidence. Do not be deceived by the bucolic title; the "farm" is not a farm; it is not even a minimum security prison; it is a medium security prison. Ustrak testified

that the difference between medium and maximum security at Pontiac "is better food, better accommodations, less attention put on you daily," and that his living conditions would have been "100 percent better." This is the entire evidence regarding the difference between living conditions in the two sections of the prison. Even though Ustrak had lived in the "farm" after his request for a transfer was finally granted, he did not testify about the living conditions there. He offered merely a conclusion.

The lack of evidence cannot be ascribed to Ustrak's being unrepresented by counsel at trial. He was represented by counsel at trial. Besides testifying to his own experiences in greater detail than he did Ustrak could have called witnesses from the prison staff to describe differences, if there were any, in cell sizes, prisoners' daily routines, diet, or incidents of violence, to bolster his conclusory observation about the difference in living conditions. The loss of amenities within prison is a recoverable item of damages, true, but it must be proved; it cannot be assumed; yet so far as the evidence of record in this case is concerned the difference in living conditions between the maximum and medium security sections of Pontiac is insignificant. Evidence in another recent case suggests that in fact inmates in the "farm" "enjoyed substantially greater freedom of movement than residents of the maximum security unit." *Mathews v. Fairman*, 779 F.2d 409, 410 (7th Cir.1985). No such evidence was introduced in this case. And no effort to attach a dollar value to the difference between living conditions in the two parts of the prison was made.

■ In the general run of tort cases, if only the fact and not the extent of injury is proved only nominal damages may be awarded. This principle has been applied to constitutional torts, notably in *Carey v. Piphus*, 435 U.S. 247, 264–67, 98 S.Ct. 1042, 1052–54, 55 L.Ed.2d 252 (1978). In some areas of the law, of course, such as defamation, "general damages" are recovera-

ble without proof of specific loss; and this principle may have some application in cases of constitutional tort. Sometimes damages for loss of a constitutional right are impossible to monetize; and then it is general damages or nothing. That might be true where a person was prevented from exercising his rights of free speech. But that is not Ustrak's case. He claims that he was retaliated against for exercising those rights—not that he was ever prevented or deterred from exercising them. Hence all he can recover by way of damages is the cost that the retaliation imposed on him. And he failed to prove any such cost.

The failure of proof is underscored by comparison with cases where damage awards for improper confinement have been upheld. *Smith v. Rowe,* 761 F.2d 360, 368 (7th Cir.1985), upheld an award of $80,-770 in compensatory damages for the improper confinement of a woman in solitary confinement for almost two years, causing weight loss, mental anguish, and humiliation. No adverse consequences to Ustrak from the delay in transferring him to the "farm" were proved. In *Saxner v. Benson,* 727 F.2d 669, 672–73 (7th Cir.1984), aff'd under the name of *Cleavinger v. Saxner,* ___ U.S. ___, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), we upheld an award of $4,500 in compensatory damages for confinement to segregation for 35 days. We did so on the basis of evidence, entirely missing in this case, of "extremely unsanitary and repulsive conditions" of confinement and of mental and emotional distress resulting therefrom. Ustrak relies on *Mary & Crystal v. Ramsden,* 635 F.2d 590 (7th Cir.1980), but the total damages there were only $6,900—to compensate two teenage girls for being placed improperly in solitary confinement for a total of 48 days, with all sorts of unpleasant consequences having no counterpart in this case. We have been at pains to emphasize in recent cases that damages, like every other contested element of a plaintiff's case, must be proved in order to be recovered; a plaintiff who wants substantial damages can't just ask for them. *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1144 (7th Cir.

1985); *Taliferro v. Augle,* 757 F.2d 157, 162 (7th Cir.1985). Ustrak's brief does not bother even to discuss the compensatory damages awarded for the delay in transferring him to the farm.

We do not mean to erect insurmountable barriers to proof of damages in cases of intangible harm. If Ustrak for example had put in evidence on the difference (if any) in the size of cells between the maximum security part of Pontiac prison and the farm, he would have given the jury some basis for estimating the dollar value of the disamenity of being in the smaller cell two months longer. Instead the jury was asked to speculate in a void.

The failure of proof on extent of loss does not invalidate the award of punitive damages for the refusal to transfer Ustrak to the "farm," since the object of punitive damages is to deter rather than to compensate. But we think that the award of punitive damages for the transfer, $15,-000, was grossly excessive (and again Ustrak's brief contains no separate discussion of those damages). Any violation of constitutional rights is reprehensible, but this one was at the bottom of the scale of gravity. Faced with having to decide whether to transfer a convicted bail jumper to a part of the prison that is easier to escape from (oddly, in describing the "farm," Ustrak's brief emphasizes that it has only one fence around it), the warden allowed annoyance with a pest—Ustrak's own counsel describes Ustrak as "a chronic complainer"—to color his judgment. We have been forced to assume that this violated the First Amendment, but it subjected Ustrak to what appears to have been at worst a trivial deprivation of amenities. Any award of punitive damages in excess of $1,000 would be unconscionable.

The damages awarded by the jury, not only for the violation of Ustrak's right to criticize but also for the denial of the library clerkship ($15,000 compensatory and $15,000 punitive), were so extraordinary as to suggest that not only the jury's assessment of damages but also its assessment of liability may have been tainted by "passion

and prejudice," thereby requiring that the entire verdict, and not merely the damages part of it, be set aside. *Douglass v. Hustler Magazine, Inc., supra,* 769 F.2d at 1143; *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 282–83 (5th Cir.1975). But the warden has not asked for a new trial on this ground. So far as the jury's damage award is concerned, all he wants is a reduction in damages; so that is all he can get.

The last issue is whether the district court was right to grant summary judgment for the warden in the matter of the punishment of Ustrak for violating a regulation that forbids inmates' "being disrespectful to any employee of the institution" and "swearing, cursing, or us[ing] ... any other vulgar, abusive, insolent, threatening, or improper language toward any other resident [i.e., inmate] or employee or indecency in language, action, or gesture at any time." Ustrak had written a letter in which he called prison officers such things as "stupid lazy assholes," and invited them to "bring their fat asses around the gallery at night." He argues that the regulation violates the First Amendment.

If inmates have some First Amendment rights, still they have only those rights that are consistent with prison discipline. The *Jones* case, cited earlier, upheld a ban on soliciting membership in a prisoners' union; *Martinez* held that prison officials may censor prisoners' mail. See also *Gregory v. Auger,* 768 F.2d 287, 289–90 (8th Cir.1985). The regulation at issue here bears an even more direct and elementary relation to the needs of prison administration. We can imagine few things more inimical to prison discipline than allowing prisoners to abuse guards and each other. The level of violence in American prisons makes it imperative that the authorities take effective steps to prevent provocation. Admittedly the regulation is somewhat vague and overbroad, especially in the use of words like "disrespectful" and "abusive" —and quixotic, too, in forbidding inmates to use "improper language." But the concepts of "overbreadth" and "vagueness" in the jurisprudence of the First Amendment were devised in order to prevent the slightest discouragement of free speech, and therefore have only limited relevance to a sphere where the right of free speech is limited. People who want to enjoy the full panoply of constitutional rights to express themselves had best refrain from committing crimes punishable by imprisonment.

We note that the Supreme Court has held that the concepts of vagueness and overbreadth have less scope when applied to the regulation of the free speech of soldiers than when applied in the civilian sphere, because of the special needs of military discipline. *Parker v. Levy,* 417 U.S. 733, 756–60, 94 S.Ct. 2547, 2561–64, 41 L.Ed.2d 439 (1974). The same is true with respect to communication within prisons. That is not to say that the concepts have no relevance at all to such communication. *Martinez* invalidated regulations that authorized the "censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, religious, or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate.'" 416 U.S. at 415, 94 S.Ct. at 1812. (Our own case of *Aikens v. Jenkins,* 534 F.2d 751 (7th Cir.1976), was similar. See, e.g., *id.* at 756–57.) But this was far vaguer than anything in this case, and the authorization thus given the prison censors had in fact been abused, see 416 U.S. at 415, 94 S.Ct. at 1812, to the detriment not only of the prisoners but of their correspondents outside the prison. Yet in upholding the invalidation of the regulations the Court did not suggest that it was incorporating wholesale the doctrines of vagueness and overbreadth that have evolved in cases dealing with the freedom of speech of free people, did not cite any of the cases that had established or applied those doctrines, and did, as we have noted, uphold the principle of censoring prisoners' mail, which would be an intolerable affront to a nonprisoner's freedom of speech. The vagueness is far less in this case than in *Martinez* and there is no evidence of abuse; Warden Fairman's retaliation against Ustrak for writing him letters of complaint was unrelated to the regulation.

To summarize, the dismissal of Count V of the complaint, challenging Ustrak's punishment for indecent language, is affirmed, as is the finding of liability for retaliating against Ustrak for criticizing his treatment in the prison. The other findings on liability are reversed with instructions to dismiss the pertinent parts of the complaint. The award of actual damages for retaliation is set aside; Ustrak is entitled only to nominal damages of $1 to compensate him for that wrong, and judgment should be entered accordingly. Finally, the warden shall be granted a new trial on the charge of retaliation unless Ustrak agrees to remit all but $1,000 of the punitive damages awarded by the jury. No costs will be awarded in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.