In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-4112

KEITH GOWER,

*Plaintiff-Appellant,*

*v.*

JEFFREY VERCLER and RYAN GARRETT,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01-2030—**Michael P. McCuskey**, *Judge.*

ARGUED MAY 20, 2003—DECIDED JULY 23, 2004

Before COFFEY, KANNE, and DIANE P. WOOD, *Circuit Judges.*

COFFEY, *Circuit Judge.* On February 12, 2001, the Plaintiff-Appellant, Keith Gower, filed suit in federal court against two Champaign County, Illinois, sheriff's deputies seeking redress for the alleged violation of his Fourth Amendment rights, pursuant to 42 U.S.C. §§ 1983 and 1985, and malicious prosecution, pursuant to Illinois law. Gower's claim was based on his assertion that on February 12, 2000, Deputies Jeffrey Vercler and Ryan Garrett illegally entered his home and arrested him for violation of

720 Ill. Comp. Stat. 5/26-1(a)(1), Illinois' disorderly conduct statute. The case was tried before a jury and after all the evidence had been submitted, Gower moved for a directed verdict under Rule of Civil Procedure 50(a). After hearing arguments, the trial judge denied Gower's motion, and the jury proceeded to find in favor of the Defendants on each of the claims, the § 1983 and Illinois tort claims. Gower appeals, urging us to hold that the district court erred in denying his motion for a directed verdict and, in the alternative, that the jury's verdict was unsupported by the evidence and, thus, was unreasonable. We affirm.

## I. BACKGROUND

In 1999, Keith Gower ("Gower") lived in a rural area of Champaign County, Illinois, with his wife, Tina, and with his two children, Kassandra and Preston. The Gowers were geographically close neighbors of Tina's mother and stepfather, Thomas and Diana Taylor. Indeed, the homes of the two families were located approximately 70 yards apart from each other. In spite of their proximity, however, the Gowers and Taylors have a documented history of animosity towards each other, which has occasionally necessitated the involvement of law enforcement officers. For example, on October 31, 1999, Deputy William Oliger, who is not a party to this suit, and Defendant Deputy Jeffrey Vercler of the Champaign County Sheriff's Department responded to an emergency call alleging a domestic disturbance at the Gower residence. Diana Taylor had placed the call, requesting assistance and stating that her husband and Keith Gower were exchanging verbal insults across their respective property lines. After the deputies had investigated the matter, Gower told them that he was going to stay somewhere else for the remainder of the night so that he could "cool off." Having diffused the situation and assured the

safety of the parties, the deputies refrained from issuing any citations nor did they make any arrests.

A few months later, on the evening of February 11, 2000, the two families again engaged in a dispute, this time due to the Gowers' refusal to allow their son Preston to visit the Taylors' home. When they returned home that evening, Diana Taylor told the Gowers that she was going to take Preston with her. However, the Gowers refused to allow Preston to go because they were concerned that Diana's smoking would aggravate his asthmatic condition.[1] This sparked an argument, which resulted in Thomas Taylor, who was nearby, getting involved. Thomas allegedly charged up the driveway of the Gower home and simultaneously appeared to be reaching for a buck knife that he commonly carried in his back pants pocket; however, neither party alleges a weapon was ever brandished. In response to this perceived threat, Gower stated that he went back to the kitchen and grabbed a six-inch chef's knife and held the weapon out of view while he returned to the front door where his wife Tina was trying to reason with her step-father.[2] According to the Gowers, the Taylors continued to demand that Preston remain with them and repeatedly asked the Taylors to leave. However, Thomas Taylor claims that Keith Gower also waived the knife he was holding at him and threatened that "he [was] going to urinate on [Thomas's] grave when [he was] dead." (Tr. 141.) In any event, Thomas retreated before the argument escalated into physical violence and Diana called the police. Once again Deputy Oliger was one of the officers who responded to the call, but for a second time, he refrained from issuing any

---

[1] During previous day's trip to the hospital, Preston had been prescribed steroid medication for his asthma flare-up, signifying his condition was worsening.

[2] According to Keith Gower, he never revealed his possession of the knife.

citation or making any arrests. Instead he suggested to the parties that they apply for orders of protection against each other, if they should be so inclined.

The next morning, February 12, 2000, Champaign County deputies responded to yet another heated confrontation between the Gowers and Taylors, which is the subject of this action. Just before 6:00 a.m., Diana Taylor placed a 911 call alleging that a domestic disturbance had once again occurred involving Keith Gower and her husband. Deputy Vercler was the first to respond to the dispatch and, while en route to the scene, he was informed by the sheriff's department dispatcher that deputies had been called to the scene the night before to respond to a domestic disturbance call. Vercler was the first to arrive at the Taylor residence and he proceeded to interview Diana Taylor about the alleged incident. During their conversation, the deputy noted that Mrs. Taylor was "very upset" and observed her "visibly shaking" and "crying." (Tr. 160.) Diana informed Vercler that while her husband, Thomas, was leaving for work that morning, Keith Gower shouted several obscenities from his residence directed at her and her husband, although she refused to repeat the exact language used by Gower, stating only that "[i]t's too horrible."[3] (Tr. 160.) Continuing his investigation, Deputy Vercler telephoned Thomas Taylor on his mobile phone and talked to him while he was en route to work. Thomas informed Vercler that, as he was walking to his garage to leave for work, Gower shouted "fuck you" three or four times, called him "a fat son-of-a-bitch," and made noises that sounded like a

---

[3] While Deputy Vercler testified at trial that Mrs. Taylor would not divulge any more information to him regarding precisely what Gower had been yelling at the Taylors that morning, during her own testimony, Mrs. Taylor stated that "I was being called a psycho b-i-t-c-h. My husband was called a big fat a-s-s MF'er and *threatening our lives.*" (Tr. 153. (emphasis added)).

clucking chicken. (Tr. 176.) Deputy Vercler testified at trial that, during his investigation, he also learned from Diana (and perhaps from the emergency police dispatch call, although he could not remember for certain) that during the altercation the previous evening Gower had brandished a butcher knife.

After Vercler had completed his investigation with the Taylors, Defendant Sheriff's Deputy Ryan Garrett arrived on the scene, and the two deputies proceeded to the Gower residence. At trial, the parties gave conflicting accounts of the incident that followed. Gower testified that he never gave the deputies permission to enter into his house. Rather, he stated that, after getting up to call the family, he went back to sleep and later awoke to a loud knock on the door. He thought the noise was made by his seven-year-old son, Preston, who, according to the Gower, would on occasion jokingly make "fake knock[ing]" sounds. (Tr. 62.) When Preston yelled to his father that people were at the front door, Gower testified that he responded with "Ha, ha. Very funny, Preston. Ha, ha." *Id*. Gower stated that when he heard adult voices in the living room shortly thereafter, he called out to Preston and inquired as to whom he had let into the house,[4] at which time he heard someone say, "Keith, can you come out in the living room, please." (Tr. 63.) Gower testified that, while still in his bedroom, he asked for the visitors to identify themselves and was told that they were sheriff's deputies. According to Gower, he then awoke his wife and they proceeded to the living room to speak with the deputies.

---

[4] As a seven-year-old with a mental capacity of about a four or five year-old, it is highly doubtful that Preston possessed any authority, either actual or apparent, to consent to the officers' entry into the Gower home. In any event, the Defendants do not contend that Preston had authority to consent to their entry of the home, and the issue is not before this Court.

In contrast to Gower's testimony, Deputy Vercler testified that when he knocked on the door, Preston Gower answered. Vercler stated that he (Vercler) then yelled "Keith," to which he heard a reply of "yeah" from down a hallway. Vercler claims that he promptly announced that he was with the Sheriff's Department and asked, "Can we come in?", to which the Gower again responded "yeah" at this time. The deputies entered the house and Gower appeared in a bathrobe. The officers stated that they proceeded to question Gower about the alleged insults that he had directed at the Taylors earlier that morning. Vercler and Garrett further testified that Gower initially told them that he had not been out of bed yet that day but eventually reversed his story and said that, at 6:00 a.m., he had arisen to call the cat in from outdoors and then returned to bed. Gower denied ever making the statements that the Taylors alleged he had made that morning.

After interviewing Gower, the deputies arrested him for disorderly conduct, (a class C misdemeanor in Illinois, *see* 720 Ill. Comp. Stat. 5/26-1(a)(1)), based upon his alleged profane and combative statements to the Taylors—to wit, "fuck you, fuck you, fuck you, fat son-of-a-bitch." Later that day, the Champaign County State's Attorney formally charged Gower with disorderly conduct, to which later Gower pled not guilty and requested a jury trial. Thereafter, on the first day of his jury trial, the State voluntarily dismissed the disorderly conduct charges against Gower.[5]

Gower subsequently filed suit against the deputies under 42 U.S.C. § 1983, alleging that Vercler and Garrett violated his Fourth and Fourteenth Amendment rights by, first, entering his home without his consent or a warrant and, second, by arresting him without probable cause. In

---

[5] The record on appeal fails to explain the State's reason for dismissing the charges.

addition, Gower also brought an Illinois common law claim against the officers, under the district court's pendant jurisdiction, for the intentional infliction of emotional distress. A two-day jury trial ensued on Gower's claims against the deputies, at which all of the principals to the events underlying his arrest for disorderly conduct testified. At the close of the evidence, Gower requested a directed verdict, arguing that, as a matter of law, the Defendants lacked probable cause to arrest him for disorderly conduct based merely upon the alleged words that he spoke to the Taylors. The district judge denied the motion, and the jury found in favor of the defendant officers on both counts.

## II. Analysis

Gower appeals, presenting the following issues: (1) whether the Defendants' warrantless entry into his residence violated the Fourth Amendment; and (2) whether the district court erred in denying his motion for directed verdict because the deputies lacked, as a matter of law, probable cause to arrest him for disorderly conduct.

We review a trial court's denial of a directed verdict *de novo*, viewing all the evidence in the light most favorable to the non-movant. *Byrne v. Bd. of Educ., Sch. of West Allis*, 979 F.2d 560, 564 (7th Cir. 1992). Furthermore, where, as here, a jury subsequently returned a verdict, "[t]his Court is limited to deciding only whether the evidence presented at trial, with all the reasonable inferences drawn [therefrom], 'is sufficient to support the verdict when viewed in the light most favorable to the [prevailing party].'" *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1043 (7th Cir. 2000) (quoting *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998)); *see also Newsome v. McCabe*, 319 F.3d 301, 303 (7th Cir. 2003); *Albrechtsen v. Bd. of Regents of the Univ. of Wis. Sys.*, 309 F.3d 433, 435 (7th Cir. 2002). When reviewing a jury verdict, we are not allowed to reweigh the

evidence or substitute our own credibility determinations for that of the jury because "[q]uestions of 'credibility and weight of the evidence [are] within the purview of the jury, whose verdict cannot be lightly set aside so long as it has a reasonable basis in the record.'" *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001) (quoting *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir. 1985)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant [to a directed verdict motion] is to be believed, and all justifiable inferences are to be drawn in his favor."); *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1062 (7th Cir. 2001). Thus, in order to prevail, Gower must establish that "'no rational jury could have brought in a verdict against [him].'" *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999) (quoting *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 745 (7th Cir. 1994)). With this degree of deference toward the jury's verdict in mind, we address each of Gower's Fourth Amendment claims.

Initially, we address Gower's assertion that the Defendants' warrantless entry into his residence violated his constitutional rights under the Fourth Amendment. It is well-settled that "[p]olice generally need a warrant to enter a home," *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003), and that "[w]arrantless searches are per se unreasonable under the Fourth Amendment." *United States v. Hughes*, 993 F.2d 1313, 1315 (7th Cir. 1993); *see also United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000) ("A warrantless entry into a residence to effect an arrest is presumptively unreasonable under the Fourth Amendment.") (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). However, it is recognized that if "someone with authority to do so consents to the entry, the entry is reasonable and the Fourth Amendment is not violated."

*Walls*, 225 F.3d at 862; *accord United States v. Durades*, 929 F.2d 1160, 1163 (7th Cir. 1991). The existence of voluntary consent to a warrantless entry of a residence "is a question of fact to be determined by the totality of the circumstances," *United States v. Marshall*, 157 F.3d 477, 483 (7th Cir. 1998), and a determination that consent to enter existed will only be reversed if it is clearly erroneous, *Walls*, 225 F.3d at 863 (citing *United States v. Durades*, 929 F.2d 1160, 1163 (7th Cir. 1991)).

*A. Voluntary Consent*

In the instant case, the issue of whether Gower voluntarily consented to the warrantless entry of his home clearly amounted to a credibility determination for the jury to resolve. Deputies Vercler and Garrett testified at trial that Gower voluntarily gave his consent to the deputies to enter. In particular, Vercler testified that once Gower's son answered the door, he and Garrett, while still standing outside the front door, yelled into the house, calling aloud "Keith." (Tr. 162-63.) Vercler testified that Keith replied, "yeah," after which Vercler identified himself as with the Sheriff's Department and asked in a loud voice, "Can we come in?" According to Vercler, Gower again replied "yeah," and, after this statement, the deputies crossed the threshold and entered into the house. During his testimony, Deputy Garrett corroborated Vercler's account of their entry into the Gower home, stating that "[Gower] invited us in the residence." (Tr. 213.) The plaintiff disagreed, testifying that he never consented to the officers' entry. In particular, Gower claimed that it was not until he heard adult voices in the living room that he called out to his son and asked whom he had let into the house, only to hear a man identifying himself as from the Sheriff's Department ask Keith to come out to the living room.

Because the jury found in favor of the Defendants, it is clear that they accepted the deputies' version of the facts to being more credible than Gower's; a conclusion we refuse to disturb:

> We will not second-guess a jury on credibility issues. While this court's review is confined to the "cold pages" of an appellate transcript, the jury had an opportunity to observe the verbal and non-verbal behavior of the witnesses, including the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements . . . . [I]t is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses.

*Kossman v. Northeast Ill. Reg'l Commuter R.R.*, 211 F.3d 1031, 1037-38 (7th Cir. 2000) (citations omitted); *see also United States v. Bogan*, 267 F.3d 614, 623 (7th Cir. 2001) ("[A] credibility determination . . . is solely within the province of the jury"); *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 606-07 (7th Cir. 2000). After weighing the officers' testimony against that of the Plaintiff-Appellant's testimony, a rational jury could have properly determined that Gower voluntarily gave the Defendants his verbal consent to enter the house subsequent to the Defendants identifying themselves (before crossing the threshold of the Gower home and making entry) and asking permission to enter. Accordingly, the jury's finding that the deputies' warrantless entry into Gower's residence did not violate his Fourth Amendment rights was entirely reasonable. We reject Gower's assertion that he was entitled to judgment as a matter of law as to this Fourth Amendment claim based on the deputies' alleged warrantless entry into his home.[6]

---

[6] We also note that the officers initially entered Gower's home only to investigate the Taylors' claim and not to arrest Gower. It

(continued...)

*B.  Probable Cause*

Gower next argues that the Defendants lacked, as a matter of law, probable cause to arrest him for disorderly conduct and that the district court should have granted his motion for a directed verdict.[7] Probable cause exists to arrest a suspect "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) (citations and internal quotations omitted); *see also United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). Probable cause is a "commonsense determination, measured under a reasonableness standard." *Spiegel*, 196 F.3d at 723 (citations and internal quotations omitted). Furthermore, "[t]he existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information." *Id*. It is largely irrelevant—for purposes of determining an arresting officer's liability—whether the person arrested is later found to be innocent. *Id*.; *see also Michigan v. DeFillippo*, 443 U.S. 31,

---

[6]  (...continued)
is clear from the trial testimony that Officer Vercler made his probable cause conclusion only *after* he had communicated with the Gower regarding the alleged incident and had concluded that Gower's chronicle was unworthy of belief.

[7]  Gower also asserts that a warrantless arrest inside a suspect's home, even with probable cause, is lawful only if the suspect is arrested for a felony, but this argument is wholly without merit: "[Illinois law] allows a full custodial arrest for *any* crime on probable cause," *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 441 (7th Cir. 1986) (emphasis added) (discussing Illinois law allowing a custodial arrest for a misdemeanor), and a misdemeanor offense is a crime.

36 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."). Instead, "[s]o long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest." *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998).

The Illinois statute proscribing disorderly conduct reads: "A person commits disorderly conduct when he knowingly does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 Ill. Comp. Stat. 5/26-1(a)(1). In applying this provision, Illinois courts have recognized that "the types of conduct intended to be included under this section almost defy definition." *People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980) (internal quotation omitted). We have also previously noted that, under Illinois law, the determination of whether particular conduct is disorderly depends on how unreasonable it is in relation to the surrounding circumstances. *See Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir. 1993).

When viewed in the context of the family conflict that plagued the Gowers and the Taylors, *cf. Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (stating that a jury must analyze an arrestee's words in relation to the surrounding circumstances), we are confident (as was the jury) that the deputies had probable cause to conclude that Gower's conduct directed at the Taylors in the early morning of February 12, 2000, rose to the level of disorderly conduct under Illinois law. At trial, evidence was presented by the Defendants—which, given that they prevailed before the jury, we must believe for the sake of this challenge, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)—showing that, at time of arrest, the arresting deputies were personally well aware of the history of

tension between Gower and his in-laws (Taylors). Testimonial evidence was also presented explaining that, when the deputies arrested Gower, they had knowledge of the fact that he had brandished a butcher knife in the presence of the Taylors the night before as well as knowledge of his obscene and overly aggressive language used the following morning. Specifically, this conduct consisted of the Gower shouting personally abusive obscenities directed at the Taylors and of his attempting to provoke a violent reaction by figuratively insulting Mr. Taylor's courage (by mocking him as a "chicken"). Additionally, Deputy Vercler observed that Diana Taylor was "quite upset," crying and visibly shaking as a result of her encounter with Gower. This observation further supports the conclusion that the vulgar insults leveled at the Taylors would naturally incite trouble among reasonable people and were intended to be abusive. In light of these circumstances, a rational jury certainly could have found that the deputies reasonably believed that Gower knowingly "act[ed] in such unreasonable manner as to alarm or disturb" the Taylors, thus "provok[ing] a breach of the peace." 720 Ill. Comp. Stat. 5/26-1(a)(1). In fact, the type of behavior that Gower is alleged to have displayed seems to be exactly the type that the Illinois disorderly conduct statute is designed to address. Thus, it was more than just "fairly possible" that the jury would conclude, as it did in its verdict, that the Defendants possessed probable cause to arrest Gower for the crime of disorderly conduct. *See Anderson*, 477 U.S. at 254.

The gravamen of Gower's directed verdict motion, however, was that his arrest under the Illinois disorderly conduct statute would *in this case* violate his First Amendment right to free speech. That is, he is arguing that an arrest which is premised merely on the words he yelled at the Taylors (i.e., shouting "fuck you" a number of times, calling Thomas Taylor a "big fat son-of-a-bitch" and "clucking" like a chicken) on the morning of February 12, 2000, would

improperly punish constitutionally protected speech. Illinois courts have previously addressed how constitutional requirements essentially provide an additional element for the disorderly conduct statute in the context where words alone are deemed to be disorderly. Freedom of speech is one of our most precious guarantees under the constitution; "it is a fundamental right protected from invasion by the state by the fourteenth amendment." *See People v. Redwood*, 780 N.E.2d 760, 762 ( Ill. App. Ct. 2002). However, "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include . . . the insulting or 'fighting' words . . . ." *Id.* at 763 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). By their very nature "fighting words . . . provoke a breach of the peace, such that they satisfy a necessary element of disorderly conduct." *People v. Allen*, 680 N.E.2d 795, 799 (Ill. App. Ct. 1997). Also, as this Court has noted and reiterated a number of times "the emphasis of the statute is upon the tendency of the conduct to disturb others and to provoke disruptions of public order and upon the unreasonableness of the activity when viewed in the context of the surrounding circumstances." *Terket v. Lund*, 623 F.2d 29, 31 (7th Cir. 1980) (quoting *United States v. Woodard*, 376 F.2d 136, 139 (7th Cir. 1967)). Therefore, when viewed in context of the totality of the circumstances, "[i]t is clear that the right to knowingly commit an act in such an unreasonable manner as to provoke, make or aid in making a breach of the peace does not come within the protections of the first amendment." *City of Chicago v. Morris*, 264 N.E.2d 1, 3 (Ill. 1970). Gower opines that his alleged statements did not constitute "fighting words" as a matter of law and, thus, his speech was constitutionally protected and the Defendant deputies lacked probable cause to arrest him for disorderly conduct.

We reject Gower's assertion because we have little difficulty concluding, as a matter of law, that Deputies Vercler

and Garrett had probable cause to believe that Gower's reported verbal assaults, directed at the Taylors, consisted of "fighting words" that "by their very utterance inflict injury or tend to incite an immediate breach of the peace," *Chaplinsky*, 315 U.S. at 572, and "the prevention and punishment of which has never been thought to raise any Constitutional problem." *Id.* at 571-72. Gower's repeated remarks to the Taylors of "fuck you," his calling of his father-in-law a "fat son-of-a-bitch," and his attempt to humiliate his father-in-law by essentially calling him a coward (i.e., clucking like a chicken), together plainly represent fighting words, because they are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20 (1971). Moreover, when these invectives come from a man who, the night before, had brandished a large knife at the Taylors—the intended audience of his abusive words on the morning of February 12, 2000—the likelihood of a violent, immediate reaction is only magnified. *See Terket*, 623 F.2d at 31. That Mr. Taylor properly exercised restraint by refraining from retaliating in a violent manner to the insults (probably so that he would not be tardy for work) does not alter the fact that Gower's words were those which "[a] reasonable onlooker would have regarded . . . as a direct personal insult or an invitation to exchange fisticuffs." *Texas v. Johnson*, 491 U.S. 397, 409 (1989), and which breached the peace. *Cf. Allen*, 680 N.E.2d at 799 (explaining that under Illinois law the term "breach of the peace" describes "conduct that creates consternation and alarm. It is an indecorum that incites public turbulence; yet violent conduct is not a necessary element.").

In all, Gower's inflammatory, implicitly threatening, and personally abusive language, which was uttered after Gower had brandished a butcher knife at the Taylors the night before, is not the type of speech which is protected by

the First Amendment and, therefore, the Illinois disorderly conduct statue was not applied unconstitutionally against Gower based on the facts of this case. Thus, the jury was properly allowed to rule in favor of the Defendants on Gower's claim that Deputies Vercler and Garrett lacked probable cause to arrest him for disorderly conduct. The trial court's denial of Gower's motion for a directed verdict was correct.[8]

## III. Conclusion

For the reasons stated herein, the judgment of the district court is

AFFIRMED.

---

[8] Because we hold that Gower's arrest did not abridge any of his constitutional rights, we need not discuss whether, if his constitutional rights had been violated, Gower would have been entitled to physically resist arrest or whether 720 ILCS 5/7-7 is unconstitutional as overly broad. *See* 720 Ill. Comp. Stat. 5/7-7 ("A person is not authorized to use force to resist an arrest which he knows is being made either by a peace officer or by a private person summoned and directed by a peace officer to make the arrest, even if he believes that the arrest is unlawful and the arrest in fact is unlawful."). Regardless, Gower concedes that he did not in fact resist arrest and, therefore, he would not have standing to challenge the statute in the first instance. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that a plaintiff must suffer an "injury in fact" which would be redressed by a favorable judgment in order to have standing).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*