In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1068 & 05-1241

ALEX PEARSON,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

GEORGE C. WELBORN, Warden and
KRISTEN KWASNIEWSKI,

*Defendants-Appellees,*
*Cross-Appellants.*

Appeals from the United States District
Court for the Southern District of Illinois.
No. 3:00 cv 827—**Gerald B. Cohn**, *Magistrate Judge.*

ARGUED APRIL 14, 2006—DECIDED DECEMBER 8, 2006

Before BAUER, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Convicted murderer Alex
Pearson was just two days away from being transferred
out of Tamms Correctional Center, a maximum-security
prison in southern Illinois, when he received a disciplinary
ticket for sexual misconduct. That ticket set his transfer
from Tamms to a less restrictive prison back by more
than a year. Alleging that the ticket was trumped-up to
block his transfer from Tamms, Pearson sued Charles
Hinsley, who was then a warden at Tamms, Kristen

Kwasniewski[1], a social worker who wrote the ticket, George Welborn, also a warden at Tamms, Eric Hallan, a security supervisor at Tamms, and Keith Cooper, Deputy Director of the Illinois Department of Corrections ("IDOC"). The jury returned a verdict against Welborn and Kwasniewski*,* finding that the ticket was issued to retaliate against Pearson for complaining about conditions at Tamms and for refusing to act as a confidential informant against the Gangster Disciples once he left Tamms. After trial, Welborn moved unsuccessfully to set aside the verdict, *see* Fed. R. Civ. P. 50(b), and for a new trial, *see* Fed. R. Civ. P. 59. Pearson also moved unsuccessfully for a declaratory judgment and attorney's fees and costs. Pearson now appeals from the court's refusal to award attorney's fees and declaratory relief, and Welborn and Kwasniewski cross-appeal.

## I.

In 1998, seven years into a forty-five year sentence for first-degree murder, Pearson was transferred to Tamms as a "high security" inmate (while in prison Pearson had received a conviction for assault). In contrast to inmates in a typical "general population" prison, inmates in Tamms have no contact with other inmates. Instead, they are housed in single cells, which they leave for only an hour each day for "individualized recreation" in a 30-foot long, 15-foot wide partially-covered cement enclosure. Inmates at Tamms do not hold prison jobs, do not interact with other prisoners, and are allowed contact with visitors, if at all, only through a glass partition while in

---

[1] At the time this suit was filed, Kristen Kwasniewski's name was Kristen Terry. She has since married and is known as Kristen Kwasniewski, and we refer to her accordingly.

restraints. Prisoners at Tamms fall into two categories: administrative detention (transferred to Tamms because of administrative concerns, such as gang affiliation) and disciplinary segregation (transferred after continuing to cause problems at other lower-security institutions despite being placed in disciplinary segregation). Both classifications are subject to a "grade system." Beginning at a "C" grade, inmates progress to an "A" grade by avoiding disciplinary reports. An inmate who maintains an A grade for a year is eligible for transfer. In addition to the grade system, the administrative detention prisoners have a three-stage "level system" whereby they gain privileges by progressing from Level 1 (fewest privileges) to Level 3 (most privileges).

In 1999, IDOC also instituted a system-wide "renunciation" program, whereby prisoners could officially renounce their gang affiliations. Although prisoners at all of IDOC's prisons could renounce gang affiliation, prisoners at Tamms were required to renounce gang affiliation to be considered for transfer. This consisted of a videotaped interview and a determination by prison staff that the prisoner's renunciation was sincere. Once renunciation was complete, prisoners at Level 3 and Grade A were considered eligible for the pre-transfer unit at Tamms, known as "J-pod."

The pre-transfer program on J-pod was just getting started when Pearson successfully renounced his affiliation with the Gangster Disciples. He and four other inmates were the first in J-pod. The unit was intended to prepare prisoners for transfer to a general population prison in approximately four weeks. To that end, inmates were celled in pairs, were allowed to eat meals with their small group, and participated in group therapy. They were not, however, allowed outdoors at all, so any exercise had to be done in the central indoor area of J-pod where they ate their meals.

At trial, Pearson testified that he and other inmates complained about aspects of the J-pod program. Pearson denounced the lack of yard time *(*as a named plaintiff in a previous suit over a lack of yard time, Pearson believed he was legally guaranteed at least one hour a week outdoors). He also complained about the fact that inmates were shackled to one another around a small table for group therapy. The two other inmates who testified at trial, Edward Lee Swift and Larry Rodgers, also said that they complained about the conditions in J-pod.

Pearson testified at trial that after several weeks in J-Pod, security supervisor Captain Eric Hallan approached him and told him that he would have to work as a confidential informant once he reentered a general population prison. Hallan explained that this requirement was part of an ongoing attempt by prison administrators to "cripple" Pearson's former gang, the Gangster Disciples. Pearson was surprised by this request, because he believed that he had completed the renunciation process and did not have to do anything further beyond completing the 30-day program in J-pod. Pearson thus did not respond immediately to Hallan's request. Several days later Kwasniewski came to his cell and he discussed it with her. At that time Pearson told her that he did not feel comfortable agreeing to act as an informant because he had "disassociated" himself with the Gangster Disciples and did not want to put his life in danger. Kwasniewski responded that informing was "a part of the requirements" and that if Pearson wanted to leave Tamms he would "make the right decision*.*" Next, Cooper approached Pearson in his cell. With Warden Welborn, Kwasniewski, Hallan, and Hinsley standing by, Cooper told Pearson that if he refused to assist with the internal investigation against the Gangster Disciples, he would not leave Tamms until he either "die[d] or parole[d]."

In the ensuing week, Warden Welborn, Hinsley, and Kwasniewski each approached Pearson again to encourage him to agree to be an informant. Welborn sought to assure Pearson that the prison system would protect him. He also reiterated to Pearson that he should take advantage of the chance to get out of Tamms by cooperating. Pearson testified that before Welborn left he asked Pearson about the complaints he had been making about J-pod and also asked about the earlier lawsuit of which Pearson had been a part. Pearson told Welborn that he still had complaints about J-pod and affirmed that he had previously been a plaintiff in a lawsuit against the WDOC. Welborn then left, telling Pearson that if he ever sued him he would never leave Tamms.

Pearson also had a visit from Hinsley, who warned him that the time for his transfer was approaching and that his complaints were jeopardizing his chances of leaving Tamms. Then, just over a week before Pearson would have been transferred, Kwasniewski took him aside and assured him that he would be safe acting as an informant. She also encouraged him to make up his mind as to whether he would cooperate.

Shortly thereafter, Pearson received the disciplinary ticket that prevented his transfer—specifically, for masturbating. According to Pearson, he was in his cell urinating when Kwasniewski approached with a mental health newsletter. Kwasniewski saw that Pearson was urinating and stepped to the side of the cell while he finished. He then stepped over to the door, and she handed the letter through the slot in the door. Pearson requested some extra newsletters and Kwasniewski said she would bring some, but she never did. Instead, Mr. Eades, the "mental health professional," came back later with the extra newsletters. Pearson's cell mate, Larry Rodgers, testified to essentially the same sequence of events.

Kwasniewski, however, told a different story. She testified that when she arrived at Pearson's cell he was sitting on his bench masturbating. She said "oh, excuse me," and stepped aside. Shortly thereafter, Pearson came to the door, but when she went to hand him the newsletter, he "kept touching himself." Kwasniewski gave him the newsletters and said she would return with the extras he requested. She testified that when she did return several minutes later, Pearson was back on his bench—still masturbating—so she left. Later that day, she spoke with her supervisor and wrote a disciplinary ticket for sexual misconduct.

Pearson had a disciplinary hearing in the common area of J-pod. After he explained his version of events, he was found guilty and escorted away from J-pod and back to his old cell, his opportunity to transfer extinguished. As a sanction, he was demoted to a C grade and spent three months in disciplinary segregation.

Pearson appealed the ticket through the internal grievance process. The grievance officer recommended expunging the report and reversing all sanctions. Warden Welborn initially concurred with the grievance officer's recommendation, but later crossed out his decision and ordered that the ticket remain intact. At trial, Welborn testified that he could not recall why he changed his mind. The final reviewing agency affirmed Welborn's decision to uphold the ticket. In addition to appealing the ticket within the system, Pearson wrote Welborn to complain that he had received a "bogus disciplinary report" because he had not agreed to act as a confidential informant. He also complained about the ticket to Cooper while Hinsley and Kwasniewski were standing nearby, and Cooper responded that he had warned Pearson that he should cooperate. The disciplinary ticket had the effect of setting Pearson's release from Tamms back approximately a year-and-a-half. Pearson had to work back up to an A grade,

earn his way out of disciplinary segregation, and work back from a Level 1 to a Level 3. The disciplinary ticket for masturbating was the only ticket Pearson ever received while at Tamms.

In October 2000, while still at Tamms, Pearson sued Kristen Kwasniewski, Donald Snyder Jr., Keith Cooper, Charles Hinsley, George Welborn, and Eric Hallan. The defendants removed the suit to federal court. In his three-count amended complaint, Pearson alleged that the defendants violated the First Amendment by retaliating against him for his complaints and his refusal to act as a confidential informant (Count One), violated his right to Due Process by knowingly issuing a false disciplinary report (Count Two), and unlawfully imposed discipline without sufficient evidence (Count Three). He requested compensatory damages, a declaratory judgment that the punishment was illegal, and a transfer from Tamms. Shortly after Pearson filed his complaint, he was transferred.

The court granted the defendants' motions to dismiss Counts Two and Three of the complaint, but allowed Pearson to proceed to trial on his retaliation claim (Count One). At the close of all the evidence, the court denied the defendants' motion for judgment as a matter of law. It did, however limit Pearson's recovery to nominal damages, reasoning that he had not demonstrated that he suffered "physical injury" as required by the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(e) (no recovery for mental and emotional distress without prior showing of physical injury). Although the court expressed "reservations" about whether Pearson had an underlying First Amendment right to refuse to act as a confidential informant, it nonetheless submitted the case to the jury. The jury returned a verdict against Welborn and Kwasniewski, and awarded Pearson nominal damages of $1.

**II.**

On appeal, Pearson argues that the district court erred by denying his requests for a declaratory judgment and attorney's fees. Alternatively, he argues that he should have been allowed to present his claim for money damages to the jury. Welborn and Kwasniewski each cross-appeal, arguing that the judgment against them should be set aside. If Welborn and Kwasniewski are correct that they are entitled to judgment as a matter of law, it is unnecessary to reach Pearson's arguments. We thus begin with their cross-appeals. Both Kwasniewski and Welborn break Pearson's First Amendment retaliation claim into two components: first, his complaints regarding the conditions on J-pod, and second, his refusal to act as a confidential informant. Kwasniewski argues that there is insufficient evidence that Pearson's complaints about J-pod motivated any retaliation, and that the refusal to act as an informant cannot support his claim because Pearson has no underlying First Amendment right to refuse such a request. Welborn, for his part, maintains that Pearson has no underlying First Amendment right in either his complaints or his refusal to act as an informant. Alternatively, he argues that he is entitled to qualified immunity because there was no clearly established law prohibiting retaliating on either ground. We consider these arguments in turn.

We review the district court's denial of a motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to Pearson, the non-movant. *E.g.*, *Waubanascum v. Shawano County*, 416 F.3d 658, 664 (7th Cir. 2005). Because the jury returned a verdict in Pearson's favor, we are limited to deciding whether the evidence presented at trial, when viewed in the light most favorable to Pearson and combined with all reasonable inferences drawn therefrom, is sufficient to support the verdict. *See Gower v. Verclear*, 377 F.3d 661, 666 (7th Cir.

2004) (citations omitted). We will not reweigh the evidence, or substitute our credibility assessments for that of the jury. Indeed, we are limited to determining whether any "reasonable juror" could have returned a verdict for Pearson. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (internal quotations omitted). Despite this liberal standard, "a mere scintilla of supporting evidence will not suffice." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 975 (7th Cir. 2006) (citations and internal quotations omitted).

To succeed on his retaliation claim, it was necessary for Pearson to demonstrate that prison officials retaliated against him for exercising a constitutionally protected right. *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003). Kwasniewski maintains that all of the evidence of retaliation presented by Pearson related to his refusal to act as a confidential informant, behavior she argues is unprotected by the First Amendment. She points out that the trial testimony established that Pearson's complaints about J-pod were no different than the other inmates'; thus it is unlikely that any retaliation would be on that basis. Specifically, Kwasniewski highlights Edward Swift's testimony that all of the inmates in J-pod complained about conditions such as the lack of yard time. And Pearson himself testified that his complaints were about "the same issues that everybody else had." In fact, when asked how his complaints differed from those made by other J-pod inmates, Pearson said, "I didn't complain differently than anybody else." Thus, Kwasniewski argues, Pearson's retaliation claim against her must hinge on his refusal to act as a confidential informant, because that is the only issue that differentiates him from the other J-pod inmates who experienced no retaliation. Pearson responds that he complained about being asked to act as an informant *and* the conditions in J-pod, and that all of the complaints taken together triggered the retaliatory conduct report.

There is, however, a more fundamental problem with Kwasniewski's argument. Although Welborn renewed his motion for judgment as a matter of law after the verdict, Kwasniewski did not.[2] Nor did she file a motion under Rule 59 for a new trial. Pearson's jurisdictional statement represents that, "Defendant Kwasniewski filed no post trial motions," and Kwasniewski's jurisdictional statement states that, "Defendant *Welborn* filed a timely Post-Trial Motion pursuant [to] Rules 50(b) and 59 of the Federal Rules of Civil Procedure." (emphasis added). By failing to file any postverdict motions, Kwasniewski forfeited her opportunity to have us review the sufficiency of the evidence and direct the district court to enter judgment in her favor. *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 126 S. Ct. 980, 985 (2006) (recounting situations where "a party's failure to file a Rule 50(b) motion deprives the appellate court of the power to order the entry of judgment in favor of that party"); *Fuesting v. Zimmer, Inc.*, 448 F.3d 936, 938 (7th Cir. 2006) ("[T]he Supreme Court has now indicated that a court of appeals may not award judgment due to insufficiency of the evidence where no Rule 50(b) motion was filed after the verdict."). In *Unitherm* the Supreme Court made clear that a party's failure to comply with Rule 50(b) by renewing a motion for judgment as a matter of law after the verdict forecloses challenges to the sufficiency of the evidence on appeal. *Unitherm*, 126 S. Ct. at 987 ("[R]espondent's failure to comply with Rule 50(b) forecloses its challenge to the sufficiency of the evidence[.]"). Thus, we cannot reach Kwasniewski's contention that insufficient evidence supports the jury's conclusion that she retaliated against Pearson on the basis of his complaints about the conditions of J-pod. *Id.*

---

[2]  Welborn and Kwasniewski have been represented by separate counsel throughout this litigation.

Alternatively, Kwasniewski argues that the district court erred by denying the motion for a new trial because the verdicts were inconsistent. Specifically, she claims that the jury's verdict imposing liability on her and Welborn, but not Cooper, Hinsley, and Hallan, cannot be reconciled. As mentioned above, however, Kwasniewski did not move for a new trial, only Welborn did. This failure likely dooms Kwasniewski's claim. *Cf. Deloughery v. City of Chicago*, 422 F.3d 611, 615-16 (7th Cir. 2005) (recounting defendant's motion in the district court for a new trial premised on its claim of an inconsistent verdict). Moreover, it does not appear from the record that Kwasniewski made a contemporaneous objection to the alleged inconsistency of the verdict at the time it was rendered. In many circuits, such a failure amounts to waiver of the argument. *See, e.g.*, *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury.") (collecting cases). Whether or not that is the case in this circuit, *see Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079-80 (7th Cir. 1998) (acknowledging rule but declining to decide whether failure to contemporaneously object "constitutes a definitive waiver"), Kwasniewski's argument is meritless.

"A party claiming that inconsistent verdicts have been returned is not entitled to a new trial 'unless no rational jury could have brought back' the verdicts that were returned." *Deloughery*, 422 F.3d at 617 (citation omitted). Here, a jury could have rationally concluded that Kwasniewski's decision to write the disciplinary ticket (and Welborn's decision to uphold it) amounted to retaliation. The jury may have disbelieved Pearson's account of his exchanges with Cooper, Hinsley, and Hallan but believed the conversations with Kwasniewski occurred. Alternatively, it could have believed all of Pearson's

testimony, but concluded that the comments by Cooper, Hinsley, and Hallan were insufficient to demonstrate that they were personally involved in the retaliatory act of issuing the ticket. Either way, Kwasniewski has not demonstrated that the jury's verdict is irreconcilable with the evidence presented at trial. *See id.* at 617 ("If possible, this court must reconcile apparently inconsistent verdicts, rather than overturn them."); *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 615 (7th Cir. 1999) ("[J]ury verdicts must be interpreted so as to avoid inconsistency whenever possible.").

We thus turn to Welborn's arguments, which were properly preserved by his filing of postverdict Rule 50 and 59 motions. Welborn argues that neither the refusal to act as an informant nor Pearson's complaints about the conditions in J-pod are protected under the First Amendment, and thus he is entitled to judgment as a matter of law. The jury was instructed that Pearson bore the burden of proving that "retaliation for plaintiff's complaints regarding conditions at Tamms Correctional Center *and* refusal to act as a confidential informant was a motivating factor in the defendant's decision to act in the manner claimed." (emphasis added). Thus, the jury's verdict against Welborn represents its belief that *both* Pearson's complaints about J-pod and his refusal to act as an informant motivated Welborn to retaliate. Regardless whether Pearson's refusal to act as an informant is constitutionally protected, his complaints about the conditions in J-pod are, and there is evidence in the record to support the jury's conclusion that those complaints motivated Welborn to retaliate.[3]

---

[3] In particular, Pearson recounted that Welborn approached him and said, "what about them [sic] complaints you have with the yard and the chains, shackled up, things of that nature?" It

(continued...)

Welborn's argument is essentially that a prisoner has no generalized right to complain, and that Pearson's complaints about J-pod amount to nothing more than personal complaints undeserving of First Amendment protection. Although Welborn acknowledges as a general proposition that a prisoner's grievances about prison conditions are protected, *e.g.*, *Walker v. Thompson*, 288 F.3d 1005, 1007, 1009 (7th Cir. 2002), he claims the right does not extend to *oral* complaints about prison conditions.

Welborn first cites *Brookins v. Kolb*, 990 F.2d 308 (7th Cir. 1993) for the proposition that a prisoner may not make a retaliation claim without first demonstrating that his speech was sufficiently "important" to warrant First Amendment protection. In *Brookins* an inmate on a prisoners' paralegal committee wrote a number of high-ranking prison officials on behalf of an inmate facing several disciplinary reports. The letter requested polygraph tests for the prisoner and other parties involved in the disciplinary reports and represented that the paralegal committee would pay for the tests. Brookins (the plaintiff) sent the letter in violation of the committee rules, which required advance approval of both correspondence and disbursement of funds. Brookins sued after he was transferred as a result of the letter. We upheld the district court's grant of summary judgment for the defendants, reasoning that the speech in Brookins' letter did not warrant constitutional protection: it did not "highlight a problem with the way the prison handled its disciplinary proceedings, or urge a change of any prison policy precluding the use of lie detector tests in disciplinary proceedings against inmates." *Id.* at 313.

---

[3] (...continued)
was during that same conversation that Welborn warned Pearson that he would "never get out of Tamms" if he ever thought about filing a lawsuit against him.

Welborn attempts to analogize Pearson's complaints about the conditions in J-pod to Brookins' unprotected letter requesting the lie detector test, a request unrelated to any prison policy whatsoever. On the contrary, Pearson's complaints about the use of shackles in group therapy and the denial of yard time related to matters of concern to all J-pod prisoners. These complaints fall squarely within the description Welborn himself, quoting *Brookins*, offers as an example of what would be deserving of First Amendment protection: statements to administrators on matters of "public concern" designed to "'urge a change of any prison policy.'" (Welborn Br. at 32 (quoting *Brookins*, 990 F.2d at 313)). Welborn's characterization of Pearson's complaints as personal gripes about unimportant matters is simply unconvincing. Unlike the inmate's isolated request to administrators for a lie detector test in a prison disciplinary proceeding, Pearson's complaints related to issues affecting all J-pod prisoners and were, when viewing the evidence in the light most favorable to Pearson, designed to effect a change in prison policy.

We are equally unpersuaded by Welborn's citation to *McElroy v. Lopac*, 403 F.3d 855 (7th Cir. 2005) (per curiam). In *McElroy* a divided panel of this court concluded that a prisoner's inquiry about pay for a prison job was unprotected. *Id.* at 858-59. The plaintiff in *McElroy* was an inmate who worked in the prison sewing shop. *Id.* at 857. When it was announced that the sewing shop would be closing, McElroy inquired whether inmates awaiting another job would receive "lay-in" pay. *Id.* at 856-57. McElroy alleged that his supervisor in the sewing shop branded him a "trouble-maker" for his inquiry and retaliated against him by firing him. *Id.* The panel concluded that McElroy's inquiry related to a "personal matter," *id.* at 858, and was thus not the type of protected activity necessary to support a First Amendment

retaliation claim, *id.* 858-59. Unlike McElroy's inquiry about whether he would get paid, Pearson's complaints related to matters of public concern, namely, how the prison operated the fledgling program designed to transition prisoners from the restrictive conditions at maximum-security Tamms to a standard general population prison.

We are also unconvinced that the form of expression—i.e., written or oral—dictates whether constitutional protection attaches. Welborn acknowledges that a prison grievance is protected as "speech that is necessary to inform prison officials of prisoner needs and to protect a prisoner's right to later petition the courts," and even goes so far as to admit that Pearson's complaints would likely have been protected if he had reduced them to writing on an official grievance form. But we decline to hold that legitimate complaints lose their protected status simply because they are spoken. Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form. And although certain types of "petitioning" would be obviously inconsistent with imprisonment (marches or group protests, for example), Pearson's oral complaints do not fall into that category.

Pearson testified that when the five pre-transfer inmates arrived on J-pod, Captain Hallan told them to let him or Kwasniewski know if they had "any problems, complaints, or suggestions." Given that trial testimony, it is possible that J-pod prisoners eschewed the formal grievance process precisely because prison staff welcomed direct complaints. To then hold that those staff have a free pass to retaliate on the basis of such complaints—which would be protected if reduced to writing—makes no sense. We thus reject Welborn's argument that Pearson's complaints about the prison conditions on J-pod—conditions that affected all of the

prisoners housed there and related to the way the prison administration implemented its new program—were unprotected by the First Amendment.

Nor can we accept Welborn's argument for qualified immunity. Governmental officials performing discretionary functions are entitled to qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As we stated when rejecting a similar argument for qualified immunity in *Babcock v. White*, "federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement." 102 F.3d 267, 276 (7th Cir. 1996). In light of that recognition, we think a reasonable public official in Welborn's position would understand that retaliating against a prisoner on the basis of his complaints about prison conditions is unlawful. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (relevant inquiry is not whether "very action in question has previously been held unlawful" but whether unlawfulness would be apparent in light of pre-existing law). Pearson's complaints, made pursuant to the administration's encouragement that inmates voice their concerns, fall under the umbrella of the right to seek administrative remedy for conditions of confinement. Thus Welborn is liable for retaliating against Pearson on that basis.

That leaves Pearson's claim for attorney's fees. In his amended complaint, Pearson requested that the district court enter a declaratory judgment that the punishment was illegal, order him transferred from Tamms, and award compensatory damages, attorney's fees, and costs. Shortly thereafter, Pearson was transferred from Tamms. The district court barred Pearson from presenting his damages claim to the jury; thus, Pearson received $1 in nominal damages. Pearson then moved for $87,453 in

attorney's fees, $814 in costs, and a declaratory judgment. The court concluded that Pearson was not entitled to a declaratory judgment and that the PLRA's fee cap provision, *see* 42 U.S.C. § 1997e(d)(2), applied, limiting Pearson's attorney's fees to 150% of his recovery, or $1.50.

On appeal, Pearson reasserts his entitlement to a declaratory judgment, which he says would make the fee cap inapplicable since it limits recovery when monetary damages are the *only* relief secured. The relevant provision of the PLRA provides that: "Whenever a monetary judgment is awarded in an action [in which fees are authorized under § 1988] a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150% of the judgment, the excess shall be paid by the defendant." 42 U.S.C. § 1997e(d)(2). We have interpreted this provision to limit attorney's fees in cases where prisoners obtain monetary relief to 150% of the damages award. *See Johnson v. Daley*, 339 F.3d 582, 583 (7th Cir. 2003). Although we have never addressed the precise question of the cap's applicability to an award of nominal damages, several other circuits have. The First and Eighth Circuits have both concluded that the fee cap applies to nominal damage awards. *See Boivin v. Black*, 225 F.3d 36, 40-41 (1st Cir. 2000) (nominal damage award is "a monetary judgment" under § 1997e(d) and fee cap applies); *Foulk v. Charrier*, 262 F.3d 687*,* 703-04 (8th Cir. 2001) (same); *see also Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001) (limiting attorney's fees to 150% of money judgment that included nominal and punitive damages).

Pearson, however, maintains that the fee cap is inapplicable in his case because he never solely sought monetary damages. He claims that his "primary purpose" in this litigation has been securing a transfer from Tamms and obtaining a judgment to clear his name. As such, he

argues that he is entitled to declaratory relief in addition to nominal damages and so his recovery is not a "monetary judgment" subject to the fee cap. Those circuits holding that the fee cap applies to nominal damages have uniformly recognized that it would be inapplicable if the plaintiff secured non-monetary relief *in addition to* nominal damages. *See Boivin*, 225 F.3d at 41 n.4 ("In a case in which the court orders non-monetary redress (say, an injunction) along with a monetary judgment, the fee cap . . . would not restrict the total amount of attorneys' fees that the court could award."); *Walker* 257 F.3d at 667 n.2 ("[I]f non-monetary relief is obtained, either with or without money damages, § 1997e(d)(2) would not apply."); *Dannenberg v. Valadez*, 338 F.3d 1070, 1075 (9th Cir. 2003) ("[F]ees incurred to obtain injunctive relief, whether or not monetary relief was also obtained as a result of those fees, are not limited" by § 1997e(d)(2).).

The problem with Pearson's argument is that, as things now stand, the only relief Pearson has secured is the nominal damages award. As recounted above, in Count One of his amended complaint (the only count at issue) Pearson sought a declaratory judgment that the punishment was illegal, a transfer from Tamms, compensatory damages, and attorney's fees and costs. Before trial, Pearson was transferred from Tamms*,* thus mooting, at the very least, his request for injunctive relief. Welborn argues that his transfer also mooted the request for declaratory relief, which Welborn maintains was always linked to Pearson's request for the injunctive relief of a transfer. We agree that once Pearson was transferred, his prayer for declaratory relief largely dropped out of the picture. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (per curiam) (because prisoner claiming retaliatory transfer had been transferred yet again, claims for injunctive relief were moot and so were claims for declaratory

relief); *see also Samuels v. Mackell*, 401 U.S. 66 (1971) (equating remedies of injunctive and declaratory relief).

Moreover, by entering a declaratory judgment in Pearson's favor, the district court would be doing nothing more than reiterating the jury's conclusion that Welborn and Kwasniewski retaliated against Pearson. We are thus hard-pressed to see how such a "declaratory judgment" would constitute "other relief" distinct from the nominal damage award entered by the jury.[4] A declaratory judgment "will constitute relief, for purposes of § 1988, if, and only if, it affects the behavior of the defendant towards the plaintiff." *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam). Because Pearson has already been transferred, a declaratory judgment would not affect Welborn's behavior towards Pearson. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103-04 (1983) (threat that plaintiff would be subjected to illegal chokehold by police again "does not create the actual controversy that must exist for a declaratory judgment to be entered"); *Davis v. District of Columbia*, 158 F.3d 1342, 1348 (D.C. Cir. 1998) (entitlement to declaratory relief depends on plaintiff's ability to demonstrate real threat that the alleged wrong will recur). As such, granting Pearson's request for declaratory relief would serve no purpose—except perhaps opening the door on his request for attorney's fees. *Cf. Bontkowski v. Smith*, 305 F.3d 757, 761 (7th Cir. 2002) (reiterating that declaratory relief cannot be "sought simply as a predicate for a subsequent damages claim"); *see also Benton v. Or. Student Assistance Comm'n*, 421 F.3d 901,

---

[4] We do not by this opinion suggest that attorney's fees would be improper in the situation where the plaintiff has in fact secured a declaratory judgment. We hold only that in these particular circumstances, where Pearson has not attempted to invalidate any official or unofficial prison policy, a declaratory judgment would be largely duplicative of the jury's verdict.

908 (9th Cir. 2005) ("[T]he finding that plaintiff's rights were violated and the accompanying judgment cannot be the 'something more' required for an award of attorney's fees and costs."). We add that Pearson did not argue that the fee cap does not apply if only nominal damages are awarded. Instead, he argued solely that the cap was inapplicable because he was entitled to declaratory relief, and so we need not decide today whether the fee cap invariably applies when only nominal damages are awarded. Because we reject Pearson's request for declaratory relief, we affirm the district court's award of $1.50 for attorney's fees, which represents 150% of Pearson's $1.00 monetary award.

Alternatively, Pearson argues that the district court erred by removing his damages claim from the jury under 42 U.S.C. § 1997e(e). That section provides that "No Federal action may be brought by a prisoner . . . for mental or emotional injury suffered in custody without a prior showing of physical injury." Pearson first reasserts the argument rejected by the district court—that during the extra year at Tamms he suffered physical injury. To support this claim Pearson relies on his own testimony that as a result of the extra year he was "mentally and physically depressed" and "lost at least 50 pounds at the time." We agree with the district court that this unelaborated claim is insufficient to support Pearson's assertion that he suffered "physical injury" as that term is commonly understood. Indeed, Pearson himself fails to cite a single case to support his contention that he sufficiently proved physical injury. *Cf. Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. 1998) (prisoner's weight loss, appetite loss, and insomnia after alleged constitutional violation not "physical injury" as required by § 1997e(e)); *Herman v. Holiday*, 238 F.3d 660, 665-66 (5th Cir. 2001) (recovery barred under § 1997e(e) for prisoner's

alleged "grave emotional and mental depression" as a result of exposure to asbestos in prison).

Likewise, we are unpersuaded by Pearson's assertion that he was entitled to present a claim for lost economic damages to the jury. For this he relies on his testimony that at some unspecified time before transferring to Tamms, he had held a prison job that paid "probably $15 a month." Thus, he reasons, he presented evidence that he lost 52 weeks worth of wages, or $780.00 ($15 a week for 52 weeks) by spending an extra year at Tamms. Pearson failed, however, to present any evidence that he was guaranteed a prison job outside of Tamms. Without such evidence, we think his claim for lost wages is too speculative to warrant submitting it to the jury. *See Haslund v. Simon Prop. Group, Inc.*, 378 F.3d 653, 658 (7th Cir. 2004) ("A 'plaintiff has the burden of proving damages to a reasonable degree of certainty.' ") (citation omitted).

Finally, we reject Pearson's claim that he is entitled to damages for the more onerous conditions he endured at Tamms during his extra year of confinement. To support his claim, Pearson cites a single pre-PLRA case noting that lost amenities within prison are recoverable as damages. *See Ustrak v. Fairman*, 781 F.2d 573, 578 (7th Cir. 1986). Although *Ustrak* recognized the possibility of such damages, it rejected awarding them in that case, which dealt with a prisoner's claim that he was denied transfer to a less-onerous prison environment in retaliation for letters he sent to the warden complaining about racial discrimination. *Id.* at 577-78. Instead, in *Ustrak* we concluded that the prisoner had failed to present sufficiently specific proof of the improved conditions in the facility to which he would have been transferred. *Id.* at 578. Pearson asserts that he did present such proof, but he fails to convincingly explain how damages to compensate him for the difference in conditions would be anything

but recovery for "mental or emotional injury" now barred by the PLRA. Indeed, in *Ustrak* we contrasted the plaintiff's failure of proof to several cases where damage awards had been warranted in light of a plaintiff's specific proof of poor conditions and "mental and emotional distress resulting therefrom." *Id.* at 579; *see also Herman*, 238 F.3d at 666 (PLRA barred recovery for *mental and emotional injuries* caused by "cold showers, cold food, unsanitary dishes, insect problems, a lack of adequate clothing, and the presence of an open "cesspool" near the housing unit" at prison) (emphasis added). Accordingly, we decline to disturb the district court's decision to limit Pearson's recovery to nominal damages.

### III.

For the foregoing reasons we AFFIRM the judgment of the district court denying Welborn's postverdict motions, and we also AFFIRM the district court's award of $1.50 in attorney's fees.

A true Copy:

       Teste:

                 _____
                 *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*